UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIM. NO.  3:19-MJ-1708 (RMS) |
| AHMAD ELSHAZLY | : | May 14, 2020 |

### MOTION FOR REVIEW OF DETENTION ORDER

Mr. Ahmad Elshazly is detained at the Wyatt detention facility pending trial in connection with a complaint charging him with attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B. At the initial presentment in this matter, the Court (Spector, MJ) detained Mr. Elshazly based upon the rebuttable presumption of detention arising from the offense. Doc. 2. Following a detention hearing on February 13, 2020, the Court (Spector, MJ) ordered Mr. Elshazly to remain detained. Doc. 18. The Court likewise denied a renewed motion for release on April 30, 2020. Doc. 37.

Defendant now seeks *de novo* review of that detention pursuant to 18 U.S.C. § 3145(b) and requests that the Court order Mr. Elshazly be released to the custody of his father and that he be subject to home incarceration as well as the further conditions listed below. Absent the Court granting this relief on the basis of written submissions, Defendant requests that the Court hold a hearing concerning this motion.

1

**PROPOSED CONDITIONS OF RELEASE**

Defendant submits that under the circumstances of the present case, the following conditions, in addition to the standard conditions, are sufficient to reasonably assure Mr. Elshazly's appearance and the safety of the community:

1. Release to reside in the custody of his father at an address that has been provided the United States Probation Office;

2. A condition of home incarceration enforced by GPS location monitoring;

3. A requirement that Mr. Elshazly not possess a cellphone or internet-enabled devices;

4. A bond co-signed by Mr. Elshazly, his aunt, as well as both of his parents. Mr. Elshazly's parents would further acknowledge that their respective homes, which they own, could be subject to seizure should Mr. Elshazly flee.

## LEGAL STANDARD

Because of the nature of the charged offense, there is a rebuttable presumption that there are not conditions that can reasonably assure Mr. Elshazly's appearance in court or the safety of the community.[1] However, "[T]he government [bears] the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community. The government [bears] the ultimate burden of persuasion by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) (citation omitted).

This Court has jurisdiction under 18 U.S.C. § 3145(b) to resolve the question of Mr. Elshazly's detention. Notwithstanding the previous decision of the Magistrate Judge, this Court must review the issue of bail *de novo*—that is, the Court "should fully reconsider [the] magistrate's denial of bail and in ruling on a motion for revocation or amendment of a detention order should not simply defer to the judgment of the magistrate, but reach its own independent conclusion." *United States v. Leon*, 766 F.2d 77, 80 (2d Cir. 1985).

---

[1] "Subject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community if the judicial officer finds that there is probable cause to believe that that the person committed ... an offense under section 924(c), 956(a), or 2332b of this title." 18 U.S.C. § 3142(e)(3)(B).

## BACKGROUND

Ahmad Elshazly is a twenty-two year old American citizen. He has no criminal record whatsoever. Even with respect to the current charge, the government does not claim that Mr. Elshazly engaged in any completed criminal act (or even that he came close to doing so). Instead, the government claims that Mr. Elshazly attempted to board a ship bound for Turkey, with the eventual aim of joining ISIS in Syria. The government has not claimed that in the course of this alleged offense Mr. Elshazly coordinated in any way with any member of ISIS (or any government agent claiming to be a member of ISIS). Nor does the government allege that Mr. Elshazly had any realistic means of entering Syria to join ISIS. The government likewise has not identified any act of violence Mr. Elshazly has committed against any American.

Mr. Elshazly has extensive familial support from both his immediate and extended family. Although Mr. Elshazly's parents are divorced, both parents are willing to serve as co-signors and to acknowledge that their respective homes would be available to satisfy a judgment should Mr. Elshazly engage in conduct resulting in a bond revocation. Ahmad has lived for the past several years in Connecticut with his mother. Understanding that the allegations of this case raise questions about Ahmad's mother as a disciplinarian able to provide sufficient structure, Defendant has identified both Mr. Elshazly's maternal aunt and his father as available third party custodians. For purposes of this motion, Defendant specifically proposes Mr. Elshazly's father, an engineer and strict disciplinarian, as the most suitable custodian.

The factual issues regarding Mr. Elshazly's history and the circumstances of the case for bond purposes are set out at length in the transcript of the February 13, 2020, detention hearing, with corrections and annotations in the discussion below.

## ARGUMENT

In the magistrate judge's written decision denying Mr. Elshazly's motion for release in February, Doc. 18, the Court determined that the proposed conditions of release were sufficient to rebut the statutory presumption of detention. *Id.* at 1. The Court held, however, that the government had met both the burden of showing clear and convincing evidence that Mr. Elshazly posed a danger to the community and by a preponderance of the evidence that he posed a risk of flight. *Id*.

With respect to danger, the detention order first states that "the defendant has consistently indicated a clear desire to kill others people on behalf of ISIS and has held himself out as someone who is computer savvy, who can build computer systems, who uses encrypted applications, who has used fake phone numbers and multiple SIM cards and who teaches others how to navigate computer applications to evade law enforcement detection." *Id.*

The court's emphasis on Mr. Elshazly's allegedly professed desires and claims about himself highlights, first, the notable absence of real-world evidence corroborating that Mr. Elshazly had any capacity to "walk the walk" rather than just "talk the talk." The complaint shows that Mr. Elshazly has been under observation since at least September of 2018—and in that time he never took any action that made good on this purported "clear desire" for violence. Indeed, in a telling turn, when Mr. Elshazly was arrested in this case, he submitted without incident. Transcript of February 12, 2020, hearing at 38. The complaint affidavit, by contrast, asserts that Mr. "Elshazly stated he would not go to jail and he would fight at the airport if he had to," Doc. 1-1 at 8. Evidence of Mr. Elshazly's actual conduct—or rather lack of conduct—does not bear out the notion that his talk of dramatic action generally amounts to more than empty puffery.

Similarly, the order relies on a finding that Mr. Elshazly, who failed to complete high school, "has held himself out" as a computer-savvy person who could build computer systems. But nowhere does the government claim that in the course of investigating Mr. Elshazly for more than a year it uncovered evidence demonstrating such capacity other than as an end-user of various online communication platforms.[2] Particularly in light of the proposed condition prohibiting Mr. Elshazly from possessing electronic devices, Mr. Elshazly's demonstrated level of computer literacy does not pose a danger to the community.

The detention order responds to the complaint's puffery problem by asserting that "To the extent that there is a suggestion that the defendant's own words were not meaningful and not indicative of violent behavior, his actions corroborate the words, in that there were three instances of him engaging with total strangers simply because he felt that something about their appearance or attitude was an afront to his beliefs." Doc. 18 at 1.

These "three instances" specifically relate to alleged events that government counsel proffered at the detention hearing: "One where he was at work and he was sitting in a truck in Target here in Connecticut. Two service members came walking by. Mr. Elshazly yelled out Allahu Akbar to them"; the second "was an incident where there was a female in a store when Mr. Elshazly was working where he believed that she was inappropriately dressed, where he was pushing a piece of equipment at her rather quickly and the individual with him effectively had to -- essentially yelled at him and stopped him from hitting the woman"; and the third "was an incident where Mr. Elshazly

---

[2] In another example of apparent puffery Mr. Elshazly claimed that it's "not that hard" to build rockets and gyroscopes. Doc 1-1 at 10. As noted above, Mr. Elshazly is a 22-year-old who failed to complete high school. The government has not provided any indication that building these devices is in fact "not that hard" for someone like Mr. Elshazly.

6

was with another person where this person allowed an Orthodox Jew to walk in front of them. Mr. Elshazly became irate at this person and indicated that Muslims are at the top and why would you ever allow someone below you to walk in front of you." Transcript of February 12, 2020, hearing at 40.

The reports underlying these reported events do not bear out any remotely violent action by Mr. Elshazly. The first and third incidents, importantly, involved nothing more than words, unpaired with any action. The government presented the second incident at the detention hearing as attempted action that would have involved aggressive action except the informant "stopped him from hitting the woman." *Id*. The report regarding this incident (which can be submitted separately under seal) shows instead that the informant was unable to say definitively that Mr. Elshazly even noticed the woman. More, the report never claimed that Mr. Elshazly seemed to be at risk of hitting the woman—instead, the informant worried that Mr. Elshazly might hit her *shopping cart*. There is, ultimately, no factually grounded allegation at all that Mr. Elshazly engaged in any kind of violent behavior based upon his alleged beliefs.

Finally, with respect to dangerousness the detention order states that "far more significantly, the defendant made plans, in this case, to take a boat to Turkey to join ISIS in the fight in Syria. His statements to multiple individuals about his plans are set out clearly in the complaint affidavit, and he took specific actions to further his plan." Doc. 18 at 1.

As a measure of dangerousness, this alleged conduct by Mr. Elshazly does not come anywhere near showing he has an actual capacity for violence. As discussed above, there is no indication that he coordinated in any way with any real or imagined members of ISIS. His alleged plans and actions, moreover, did not come anywhere close to bringing him to Syria, let alone to

actually perpetrating violence. Of note, though Mr. Elshazly could legally purchase firearms and was allegedly going to be smuggled on a boat that would never involve passing anything resembling airport security, he did not obtain a gun to bring with him in his supposed quest to fight for ISIS.

The detention order also relies upon the alleged attempt to board a boat for Turkey as a basis for its holding regarding flight. And linking this alleged conduct to flight risk is facially plausible: boarding a container ship for Turkey may not pose a danger to anyone, but it does involve international travel of a rather surreptitious sort. But the government's allegations do not bear out that Mr. Elshazly has ever had anything remotely resembling the capacity to actually travel in this way. The complaint acknowledges that Mr. Elshazly believed it was not actually possible to travel to Syria (*see* doc. 1-1 at 4) and the government does not claim that Mr. Elshazly—who again has no claimed actual ISIS contacts—could actually get there.[3] The ship to Turkey that Mr. Elshazly was purportedly to board, of course, was a government ruse not a real means of travel.[4] And even that ruse would not have gotten Mr. Elshazly to Syria but rather to Turkey, a NATO ally.

The detention order further identifies Mr. Elshazly's lack of educational attainment or steady employment as sources of concern and emphasizes his parents' apparent inability to direct him. The order emphasize particularly that "[t]here is also evidence that both of his parents knew of his actions in professing support for, and a commitment to, violence committed on Americans in Syria and abroad, but could do little to stop him. Indeed, his father tried when the defendant was living

---

[3] ". . . he likely can't get to Syria, Your Honor. I'm not going to sit here and say as we stand here now that he could get there." Tr. of February 13, 2020, hearing at 34.

[4] The detention order states that "Significantly, it was the defendant who researched the flights, convinced himself that it was too dangerous to fly and decided to take a boat to Turkey because he could not inflict sufficient violence and damage unless he joined the fight abroad." Doc. 18 at 2.

with him for a short period of time in Maryland and even had a police officer visit his home in Maryland, but instead the defendant left his father's home and returned to Connecticut, where he continued, unchecked by his mother, to engage in the conduct of described above." Doc. 18 at 2.

As was articulated in connection with the April 30th hearing, Mr. Elshazly's father has indicated that these factual statements are in important respects incorrect. Specifically, Mr. Elshazly's father had no awareness of his son's alleged support of ISIS. More, the incident in which police visited Mr. Elshazly's father's house had nothing to do with religion or ideology. Rather, when Mr. Elshazly was approximately 18 years old and living with his father, he stopped attending high school. His father requested that the local sheriff's deputy responsible for monitoring the high school visit the home to get Mr. Elshazly to return to school. However, because Mr. Elshazly was already 18, the deputy was not able to be helpful. Later, when Mr. Elshazly was approximately twenty, he returned to live with his father and nearly completed an adult education program before his mother brought him back to Connecticut where he has lived for the past two years.

In short, Mr. Elshazly's father, a professional construction engineer, did not stand helplessly by while Mr. Elshazly allegedly committed the acts described in the complaint affidavit. He remains willing and able to serve as a custodian to Mr. Elshazly. He is prepared if necessary to travel to Connecticut to retrieve Mr. Elshazly and to enforce the conditions of release, including regarding home incarceration and a prohibition on access to electronic devices.

Finally, and as raised at the April 30, 2020, hearing, the Covid-19 pandemic further weighs in favor of release in this case. With respect to safety, the Bail Reform Act is premised on an assumption that detention is a tool that can be used to promote the safety of the community. The rapid progression

of the emerging COVID-19 Pandemic turns that assumption on its head. Emergency orders modifying the fundaments of everyday living in America have been issued across the country because "social distancing" is critical to slowing the spread of COVID-19.[5] These same concerns have effectively shuttered courthouses, including in this district. "But behind bars, some of the most basic disease prevention measures are against the rules or simply impossible. Separating sick people from well people to prevent the disease from spreading can be nearly impossible in prison . . . People in prisons and jails live every minute of the day in close proximity to each other."[6]

The consequences of these inescapable realities of close confinement are currently playing out in dramatic fashion at Wyatt. Since the first case was reported in the facility on April 21, there has been what appeared to be a steady upward trend, with 21 total positive tests reported on May 12. Then later that same day, results of re-testing inmates and further staff testing revealed far greater spread than previously known. The positive test count now stands at 48, including at least one member of the Wyatt healthcare staff. These numbers—and particularly the newly discovered rate of unknown spread—raise real questions about the facility's ability to ensure the safety of pretrial detainees.

The broader effects of Covid-19 also have particular salience for this case. Most obviously, travel to Syria—impracticable even at the time of the original bond hearing—is now even further out of the question as travel and movement in general are significantly curtailed. Defendant submits

---

[5] The Justice Collaborative, *Explainer: Prisons and Jails are Particularly Vulnerable to COVID-19 Outbreaks*, available at: https://thejusticecollaborative.com/wp-content/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[6] *Id*.

that any suggestion of danger Mr. Elshazly may pose domestically is entirely speculative, including for the reasons discussed further below. But even such imagined dangers are mitigated by present circumstances: social interactions of the sort the government expressed concern regarding are severely curtailed by Covid-19 restrictions, as particularly are group gatherings of any kind. A home incarceration order would further restrict Mr. Elshazly's exposure to others, as would a condition prohibiting him from accessing electronic devices.

## CONCLUSION

For the reasons above, Defendant requests that the Court, following a hearing, order that Mr. Elshazly be released pending the trial of this case subject to the above conditions.

Respectfully submitted,

THE DEFENDANT,
Ahmad Elshazly

OFFICE OF THE FEDERAL DEFENDER

Dated: May 14, 2020

/s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 14, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ James P. Maguire
James P. Maguire