UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:20CR71(VAB) |
| | : | |
| v. | : | |
| | : | |
| AHMAD KHALIL ELSHAZLY | : | June 9, 2020 |

**GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION FOR REVIEW OF DETENTION ORDER**

The United States of America, through undersigned counsel, respectfully submits the Government's Opposition to the Defendant's Motion for Review of Detention Order. *See* DE 46. The Court should deny the defendant's motion for release and order the defendant to remain pending trial pursuant to 18 U.S.C. § 3142 because (1) there is a statutory presumption that the defendant—who has been indicted for attempting to provide material support to ISIS, a designated foreign terrorist organization—should be detained; (2) there are no conditions of release that will reasonably assure the defendant's appearance and the safety of the community; and (3) the COVID-19 pandemic is not a basis for the defendant's release.

## I. PROCEDURAL HISTORY

On December 15, 2019, the defendant was arrested and charged by complaint with attempting to provide material support and resources to ISIS, a foreign terrorist organization, in violation of 18 U.S.C. § 2339B. On December 16, 2019, the defendant made his initial appearance and was ordered detained pending a hearing. On February 13, 2020, after a contested detention hearing, Magistrate Judge Robert M. Spector ordered the defendant detained after finding that there were no conditions that would reasonably assure the safety of the community or the defendant's appearance.

On April 23, 2020, the defendant filed another motion for release (DE 31), and on April 30, 2020, the Court held a preliminary hearing pursuant to Rule 51 of the Federal Rules of Criminal Procedure. During that hearing the Court found that there was probable cause to support the charge in the complaint. The Court also denied the defendant's motion for release for many of the same reasons outlined in the Court's February 13, 2020, Order. *See* DE 37. On May 14, 2020, the defendant filed the instant motion for review of the court's detention order. DE 46. On May 20, 2020, the defendant was indicted for attempting to provide material support or resources to a designated terrorist organization in a violation of 18 U.S.C. § 2339B. *See* DE 48.

## II. FACTUAL BACKGROUND

Elshazly is charged with attempting to provide material support to a designated foreign terrorist organization. Starting no later than September 2018, Elshazly consistently expressed to several confidential human sources ("CHS") his desire to travel to Syria and fight for ISIS.[1] *See* DE 1-1. In numerous conversations online and in person with CHSs, Elshazly glorified violence and fighting on behalf of ISIS, pledged allegiance to ISIS and its self-proclaimed leader, Abu Bakr Al-Baghdadi, and encouraged others to do the same. *See generally id.* This was not a new interest for Elshazly; going back to 2017, Elshazly, by his own admission, was interested in joining ISIS and communicating with persons he believed to be ISIS members, even sending a copy of his passport to an individual he believed was fighting for ISIS overseas. *See id.* at ¶ 48. During his conversations with CHS 2 in January and February of 2019, Elshazly demonstrated knowledge about the routes and methods used to travel from the United States to join ISIS in Syria. *Id.* at ¶¶ 15-17. Elshazly continued to strategize ways to travel to Syria to join ISIS, proposing in March

---

[1] CHSs are identified by the same numeric identifier as used in the affidavit for complaint.

2

2019 that he could use the ruse of making the Hajj pilgrimage to Saudi Arabia as a means of entering into ISIS controlled territory. *Id.* at ¶ 21.

Elshazly also acted as the administrator of a private 16-person chatroom in which the participants discussed their devotion to ISIS and held himself out as a computer expert who was purchasing computer and storage parts to assist ISIS in securely storing and disseminating its propaganda. *See id.* at ¶ 18. On March 11, 2019, Elshazly downloaded the application used for this chatroom onto CHS 2's phone, instructed CHS 2 on how to join the chat group, and vouched for CHS 2's membership in the group. *Id.* On March 12, 2019, Elshazly told CHS 2 that he wanted CHS 2 to witness another member of the chat group pledge bay'ah, or allegiance, to ISIS. When CHS 2 joined the chat meeting, CHS 2 heard Elshazly lead another member in reciting the bay'ah to ISIS. Elshazly told the group that CHS 2 would be pledging bay'ah in the near future. After the completion of the bay'ah, Elshazly spoke to the group for 15 to 20 minutes and reiterated his belief that the members of the group had an obligation to fight for, and help, ISIS.

Prior to that meeting, CHS 2 had twice asked Elshazly if CHS 2 could pledge bay'ah, but Elshazly told CHS 2 that CHS 2 was not ready. Elshazly gave instructions to CHS 2 regarding steps CHS 2 needed to take to be able to pledge bay'ah to ISIS. On Mach 18, 2019, CHS 2 again asked Elshazly if CHS 2 could pledge bay'ah. Elshazly told CHS 2 that once CHS 2 pledged bay'ah, there was no turning back and that Elshazly needed to ensure that CHS 2 was prepared to make the pledge. The next day, Elshazly explained to CHS 2 that Baghdadi had directed ISIS followers to (1) travel to join ISIS; (2) strike non-believers in their own land if unable to travel to join ISIS; and (3) spread the message of ISIS. *Id.* at ¶ 19. Finally, on March 21, 2019, Elshazly led CHS 2 in pledging bay'ah to Baghdadi and the Islamic State before the chat group. Elshazly also led another individual in pledging bay'ah to ISIS.

Throughout October and November of 2019, Elshazly communicated with CHS 2 and CHS 3 and repeatedly expressed his desire to join ISIS and engage in violent activity, stating, *inter alia*:

—"[W]ar has started and we are marching to it"

—"May this country [the United States] burn the same way they burned Muslims! May they burn in fire at the end!"

—"I want to go to the caliphate and kill there. I can kill maybe . . . like a hundred kaffir. I can kill them. A hundred kaffirs. If I do something here how many kaffirs could I kill? One, two, three and then I get shot and die. It is more benefitting if I go there, I could kill more and will get more faithful rewards."

—"The greater Jihad is for the sake of Allah, the one that makes you a martyr is for the sake of Allah . . . Do not think that the believer, who goes out and fight and the believer who stays behind are equal . . . No, The Mujahid who fights for the sake of Allah, is greater."

— That he wanted to be "a killer, Inshallah," and that he wanted to be a killer for ISIS.

—"I think something might happen to me soon, Allahu' Alam, but I'm ready to die Insha'Allah"

—That he was prepared to die and that he slept with a knife.

*Id.* at ¶¶ 24-28; 33; 39-40. Throughout the course of the investigation, Elshazly repeatedly expressed his desire to kill Americans and non-believers on behalf of ISIS.

On October 31, 2019, Elshazly again made a bay'ah message and re-pledged his allegiance to ISIS and, particularly, to its new leader—Abu Ibrahim Al Husseini Al Hashami Al Qurashi.[2] *Id.* at ¶ 36. Thereafter, Elshazly continued to express his commitment to traveling overseas to join ISIS. *Id.* at ¶ 41. On December 6, 2019, Elshazly sent CHS 3 a series of YouTube videos that demonstrated how to use various automatic firearms, how grenades work, how rockets work, and how to make rockets. *Id.* at ¶¶ 42-43. On December 10, 2019, Elshazly met with CHS 3. Regarding the YouTube videos, Elshazly told CHS 3 that they could build the weapons depicted and that it

---

[2] After Abu Bakr Al-Baghdadi's death, Al Qurashi was appointed the leader of ISIS.

was not hard to do so. *Id.* at ¶ 45. Elshazly told CHS 3 that he was ready to leave the United States to join ISIS. Elshazly explained if ISIS needed weapons, Elshazly would go to Turkey to design the weapons; he also said that if he was not needed to build weapons, then he wanted to go straight to Syria to fight. *Id.* at ¶ 47. After the meeting, Elshazly sent CHS 3 a series of messages confirming his decision to leave the United States so that he could join ISIS. Elshazly included a quote from the Koran:

> And kill them wherever you find them and expel them from wherever they have expelled you, and fitnah is worse than killing. And do not fight them at al-Masjid al- Haram until they fight you there. But if they fight you, then kill them. Such is the recompense of the disbelievers.

*Id.* at ¶ 50.

On December 14, 2019, Elshazly paid CHS 4, whom he believed to be an ISIS facilitator, $500 to be smuggled out of the United States and transported to Turkey by boat. *Id.* at ¶ 53. Elshazly believed that the boat would bring him to Turkey, where he would meet with CHS 3 and other ISIS members who would, in turn, help him travel to join ISIS in Syria. *See id.* On December 15, 2019, Elshazly arrived at the port to board the boat that he believed would transport him to Syria. *Id.* at ¶ 54. As he approached the boat, Elshazly was arrested. *Id.* After his arrest, law enforcement discovered hundreds of videos of violent ISIS propaganda on his phone, which Elshazly had collected, organized, and distributed to other individuals, including videos showing grotesque beheadings, violent and depraved executions of ISIS prisoners, IED attacks on U.S. and coalition forces, and even a video demonstrating how to filet a human being. *See* DE 30, Feb. 13, 2020, Transcript of Bond Hearing at 38:23-39:8.

### III. STANDARD OF REVIEW

If the Court finds that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety or any other person and the

community," the Court "shall order the detention" of the defendant. 18 U.S.C. § 3142(e)(1). Importantly, when there is probable cause to believe that the defendant committed a federal crime of terrorism for which the maximum term of imprisonment is more than 10 years, like 18 U.S.C. § 2339B, there is a presumption that no such conditions or combination of conditions exist. 18 U.S.C. § 3142(e)(3)(C). When the presumption applies, the defendant bears a burden of producing evidence that he does not pose a danger to the community or a risk of flight. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). The production of such evidence does not eliminate the presumption of detention; rather, the presumption remains a factor that the Court should consider in determining whether the defendant should be detained. *Id.*

The Court also considers the following factors, in light of the presumption of detention, when deciding whether to detain an individual pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. 18 U.S.C § 3142(g)(1)-(4). Even with the presumption of detention, the government retains the burden of persuading the Court by clear and convincing evidence that the defendant presents a danger to the community and persuading the Court, by a preponderance of the evidence, that the defendant presents a flight risk. *Mercedes*, 254 F.3d at 436.

## IV. ARGUMENT

On February 13, 2020, and again on April 30, 2020, Judge Spector carefully and thoughtfully weighed the statutory factors, in light of the presumption of detention, against the proposed conditions of release submitted by Elshazly—essentially the same conditions proposed in the instant motion—and found no conditions of release reasonably could assure the defendant's

appearance because Elshazly "was caught literally in the process of leaving the United States to fight and kill Americans abroad." Judge Spector also found—twice—that no conditions of release reasonably could assure the safety of any other person or the community, particularly given that "the defendant has consistently indicated a clear desire to kill other[] people on behalf of ISIS." *See* DE 18. The defendant's third attempt to explain away the substantial evidence against him as mere puffery is unconvincing and unsupported by the record, and his request for release pending trial should be denied.

### A. The Court Should Detain Elshazly Consistent with the Statutory Presumption

When a "judicial officer finds that there is probable cause to believe" that a defendant attempted to provide material support to a designated foreign terrorist organization, there is a presumption in favor of detention. *See* 18 U.S.C. § 3142(e)(3). "An indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e)." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011). Here, not only did the Grand Jury indict Elshazly with attempting to provide material support to ISIS, thereby establishing that the statutory presumption in favor of detention applies, but also Judge Spector held a lengthy probable cause hearing and found that probable cause existed.

"The presumption of dangerousness . . . represents Congressional findings that certain offenders . . . are likely to continue to engage in criminal conduct undeterred either by the pendency of charges against them or by the imposition of monetary bond or other release conditions." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010). To rebut this presumption, the defendant must come forward with evidence regarding dangerousness and risk of flight and should present "all the special features of his case that take it outside the congressional paradigm." *Id.* at 946; *Mercedes*,

235 F.3d at 436 (the defendant bears "a limited burden of production—not a burden of persuasion—to rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight."); *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce some evidence contrary to the presumed fact[s] in order to rebut the presumption.").

Here, Elshazly has not, and cannot, come forward with sufficient evidence, or special features of his case, to rebut the presumption of detention. Rather, Elshazly argues that his conduct amounted to mere puffery (DE 46 at 5), and that there is "no indication that he coordinated in any way with any real or imagined members of ISIS." DE 46 at 7. Elshazly also asserts that he has "extensive familial support." DE 46 at 4. None of these arguments constitute evidence—certainly not sufficient evidence that overcomes the presumption in this case—and none are supported by the record. As set forth above, Elshazly's conduct went far beyond mere puffery. Elshazly did not just talk about joining ISIS, he took affirmative steps to do so by researching potential travel routes to join ISIS and ticket prices, watching videos on how to operate and manufacture weapons, saving money, packing his bags, and arriving at a port where he believed a boat would be waiting to take him to join ISIS.

As for the defendant's claim that he never coordinated in any way with real or imagined ISIS members, this, too, is belied by the record. As early as 2017, Elshazly was, by his own admission, communicating with persons he believed to be ISIS members, and he even sent a copy of his passport to an individual he believed to be an ISIS fighter. *See* DE 1-1 at ¶ 48. Moreover, Elshazly was the leader and administrator of a private-messaging group consisting of other like-minded ISIS supporters. In that group, Elshazly extolled the virtues of fighting for ISIS and led at least two non-government actors in pledging allegiance to ISIS. Finally, as discussed in more detail

below, the record demonstrates that Elshazly's father and his aunt have not been consistent presences in his life.

In sum, the arguments offered by Elshazly are insufficient to rebut the presumption of detention, especially given the significant evidence establishing Elshazly's violent nature—that is, his steadfast desire to kill "kuffar" and join a terrorist organization that readily accepts responsibility for the death of innocent civilians around the world. Elshazly has not and cannot rebut the presumption of detention in this case. But even if the Court were to find that Elshazly had, "the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Rodriguez*, 950 F.2d at 88. Those factors, along with the application of the presumption, establish that Elshazly presents a flight risk and a danger to the community and, therefore, should be detained pending trial.

### B. Elshazly Should Be Detained Given the Nature and Circumstances of the Offense Charged

The charges and potential penalties in this case are among the most serious in federal law. Elshazly is charged with attempting to provide material support and resources to a designated foreign terrorist organization in violation of 18 U.S.C. § 2339B. Section 2339B carries a maximum term of imprisonment of 20 years and, if convicted at trial, Elshazly's sentencing guideline range, at a minimum, is 360 months to life, effectively defaulting to the statutory maximum term of imprisonment, and lifetime supervised release. *See* USSG Section 2M5.3(a); USSG Section 3A1.4; 18 U.S.C. § 3583(j). The seriousness of the offense charged and the likely punishment underscores Elshazly's dangerousness and his risk of flight.

With respect to dangerousness, Courts around the country have resoundingly recognized that the nature of offense charged here—Elshazly's attempt to provide himself as personnel to fight for ISIS, a designated foreign terrorist organization—is an inherently dangerous crime. ISIS

has a long history of particularly violent conduct, and Elshazly whole-heartedly embraced ISIS's extremely violent ideology that advocates committing heinous violent acts against civilians. There is incontrovertible evidence that Elshazly intended to join ISIS, that he wanted to procure and assist in weapons production for ISIS, that he wanted to fight on ISIS's behalf, and that he desired to kill hundreds of innocent civilians. *See* DE 1-1 at ¶¶ 24-28; 33; 39-40. Elshazly also spoke of becoming a martyr for ISIS and encouraged violence against those who did not support ISIS, including extolling attacks within the United States. *See id.* at ¶¶ 19; 24-48; 33; 39-40 (stating "may this country burn"; explaining that ISIS commands its followers to strike non-believers in their own land if they cannot join the Caliphate). The nature and circumstances of the offense charged demonstrate that Elshazly's dangerousness is real and he should be detained pending trial. *See United States v. Khusanov*, 731 F. App'x 19, 22 (2d Cir. 2018) (affirming district court's determination that this factor weighed heavily in favor of detention when defendant provided financial support to facilitate a would-be ISIS supporter's travel, and noting that ISIS has "a history of particularly violent conduct" and the goal of the defendant's conduct was "to facilitate violence by allowing persons to travel to Syria to wage 'jihad against the United States and its allies.'"); *United States v. Salkicevic*, No. 15-CR-0060, 2015 WL 52556 at *2 (N.D. Ill. Feb. 10, 2015) (finding that where a defendant was charged with providing material support to terrorists by contributing funds to be used by those fighting for ISIS, the charged offense "could scarcely be more serious, and the defendant wisely does not contend otherwise.").

As to risk of flight, Courts in this Circuit have consistently found that "a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee." *See*, *e.g.*, *Khusanov*, 731 at 21; *United States v. Jackson*, 823 F.2d 4, 6–7 (2d Cir. 1987) (concluding that "indictment under which the defendant faces at least ten years of imprisonment" created risk of flight); *United States*

10

*v. Kandasamy*, No. 06 CR 616 (RJD), 2008 WL 2660610, at *3 (E.D.N.Y. July 3, 2008) (noting that when the defendant was charged with conspiracy to provide material support to a terrorist organization, "[e]ven with defendant's clean criminal history, the Guidelines recommend a sentence between 360 months to life, capping for the moment at the statutory maximum . . . In short, he faces very serious charges, the likelihood of a long prison term, and has an incentive to flee.").

During the investigation, Elshazly emphasized that he would not go to jail for twenty years and that he would fight law enforcement if he was apprehended. *See* DE 1-1 at ¶ 32. Moreover, central to his criminal conduct and the offense charged here, was Elshazly's persistent desire to leave the United States and join ISIS where he believed he could kill hundreds of people. His attempt to do so involved a surreptitious plan to cross the ocean by hiding on a container ship without needing to provide his passport to anyone and without formally crossing borders through security. Elshazly's own statements coupled with the lengthy prison sentence he faces only provide further motivation for him to flee were he released pending trial.

**C. Elshazly Should Be Detained Given the Weight of the Evidence Against Him**

The Government's evidence against Elshazly is overwhelming. Here, the vast majority of the evidence involves recorded conversations consisting of Elshazly's own words, captured during months of recorded conversations with the CHSs, where Elshazly talked about, and actually planned for, his travel to join ISIS and kill people in support of his violent ideology. In addition, Elshazly sent many videos regarding the use and creation of weapons and explosives to CHS 3. As for physical evidence, Elshazly's phone contained an enormous collection violent ISIS videos that he distributed to other people. Moreover, following his arrest, Elshazly admitted that he knew it was illegal to try join ISIS and that he was guilty. The weight of the evidence against Elshazly is substantial and weighs heavily in favor of detention. *See Khusanov*, 731 F. App'x at 22

(affirming detention of defendant charged with providing material support to ISIS and explaining that "[a]s to the second factor, the weight of the evidence against Khusanov, the district court recognized that much of the evidence was recorded or documented, making it difficult to refute"); *Kandasamy*, 2008 WL 2660610, at *3 (finding defendant should be detained when government "proffered significant evidence implicating defendant, none of which defendant has squarely refuted" including "persuasive documentary evidence").

### D. Elshazly Should be Detained Given His History and Personal Characteristics

Elshazly's history and personal characteristics also favor his continued detention pending trial. Up until his arrest, Elshazly's life, as the defense admits, had been marked by a failure to commit or follow-through on anything—he never held a stable job and never completed high school or finished his GED courses—with one notable exception, his commitment to ISIS has been unwavering for nearly 3 years. As Judge Spector noted, Elshazly's "employment history does not suggest somebody who has a commitment, frankly, to a job or to schooling or to something that would give some guarantees that he would follow the supervision of the Court." *See* DE 30 21:2-17. He was most recently fired from his last job for failing to follow the rules.

Despite Elshazly's inability to demonstrate follow-through in all other aspects of his life, he was committed to his goal of fighting for ISIS in Syria. For more than three years, Elshazly watched gruesome ISIS videos, plotted and explored different options for getting to Syria to join ISIS, and ultimately packed his bags and attempted to board a ship he believed would take him to join ISIS. He was not deterred by the closing of the borders to Syria, but instead concocted other potential ruses, such as using the holy Hajj pilgrimage as a cover to travel to join ISIS. As Judge Spector correctly noted, "it was the defendant who researched the flights, convinced himself that it was too dangerous to fly and decided to take a boat to Turkey." DE 18 at 2. Elshazly could have

given up on his violent plot when he decided that air travel would be too difficult; instead, he persisted, and he thought he found a reasonable travel route to join ISIS and engage on the battlefield.

Elshazly also has limited ties to this district; in fact, he is proposing living outside of the district with his father in a community that Elshazly has no connection to and with a man he has spent most of his life living apart from. Although Elshazly proffers that his father is a "strict disciplinarian" (*see* DE 46 at 4), their history provides little evidence that Elshazly's father will be able to supervise him or ensure compliance. Indeed, as Elshazly concedes, when he previously lived with his father, Elshazly dropped out of high school, and his father, who enlisted law enforcement to help him, was unable to get Elshazly to finish his education. *See* DE 31 at 5. Throughout the investigation, Elshazly made clear how little he valued his relationship to his family and the community—his entire goal was to leave the United States, with no apparent notice to his family, and to take up arms against civilians. Elshazly professed that he did not want to leave anything behind; simply, he hated living in the United States. *See* DE 1-1 at ¶¶ 31-32. Moreover, Elshazly professes knowledge about evading law-enforcement detection, which further suggests that detention is appropriate. For example, Elshazly claimed to have researched FBI investigative tactics (*see id.* at ¶ 48), and he has "held himself out as someone who is computer savvy, who can build computer systems, who uses encrypted applications, who has used fake phone numbers and multiple SIM cards and who teaches others how to navigate computer applications to evade law enforcement detection." *See* DE 18 at 1.

As for the proposed bond in the form of his father and mother's homes, as Judge Spector noted, Elshazly's "ties to his father are not the kind of ties that you would suggest that it would be important to him that his father, as a co-signer no be out of money. And now we look at his aunt

. . . just don't see that she had involvement in his life prior to this case." *See* DE 30 at 28:1-15. Moreover, since his arrest, Elshazly has openly stated that he does not listen to his father. Quite simply, Elshazly's devotion to ISIS and its violent activities, his hatred for the United States and his fellow citizens, and his weak familial and community ties support his continued detention in order to ensure his appearance at trial and the safety of the community.

### E. Elshazly Should Be Detained Given the Nature and Seriousness of the Danger to the Community

The Government cannot emphasize enough the dangerousness of releasing Elshazly. This factor weighs heavily in favor of detention. Elshazly offers two main arguments as to why he is not a danger to the community. First, he claims that his actions in this case amount to mere puffery and there is no evidence that he could "walk the walk" rather than just "talk the talk," particularly because, according to the defense, Elshazly "has no claimed actual ISIS contacts." *See* DE 46 at 5, 8. Second, Elshazly claims that he has no reasonable means of getting to Syria to join ISIS. *Id.* at 4, 5, 8; *see also* DE 31 at 23:6-19. Elshazly's arguments have little merit and are heavily outweighed by the plethora of evidence demonstrating Elshazly's commitment to ISIS and its violent ideals.

First, as Judge Spector rightly found, Elshazly, himself, took action over several years to fully immerse himself in ISIS ideology and then took steps to join ISIS with the goal of killing as many civilians as possible:

> it was the defendant who collected and distributed the disturbing and grotesque videos described above, it was the defendant who led the group chat regarding the commission of violent acts in support of his beliefs, it was the defendant who researched how to use high-powered firearms and how to build rockets and bombs and then boasted that he could build them, and it was the defendant who paid $500 in cash to travel on a boat from the United States to Turkey, where he would join ISIS and commit acts of murder in furtherance of his beliefs.

DE 18 at 2. Moreover, Elshazly claims to have been in contact with actual ISIS members in 2017 and even sent his passport to an individual he believed to be an ISIS fighter. Elshazly also served as the administrator of a chat group filled with purported ISIS members. Elshazly led at least two non-governmental actors in pledging bay'ah to ISIS and encouraged the members of the group to join and fight for ISIS.

Second, although Elshazly may not be able to reach Syria to join ISIS, releasing Elshazly and the pending charges against him may compel him to commit an act of violence in the United States. There is nothing to suggest that being confined to his home will eradicate Elshazly's drive to fight for and serve ISIS—that is, serve ISIS by killing the so-called kuffar (non-believers). In recorded conversations, Elshazly described his disgust at living in the United States, stating he did not want to die a hypocrite in this country, calling for the country to "burn," and explaining that he hated living in the house of the kuffar. Elshazly also emphasized his belief that it was the duty of ISIS members to carry out attacks in the United States if they were unable to join ISIS in Syria. *See* DE 1-1 at ¶ 19. Elshazly explained he wanted to go to Syria to join ISIS because he could kill "like a hundred kaffir" in Syria, whereas in the United States he would only be able to kill a few Americans before he would be killed by law enforcement. *See* DE 1-1 at ¶ 27. Elshazly also shared numerous videos showing how to make and operate various weapons and professed that making such weapons would not be difficult. *Id.* at ¶¶ 42-45.

ISIS repeatedly has celebrated its soldiers that attack citizens and law-enforcement officers with knives (notably, Elshazly claimed to sleep with a knife under his pillow and law enforcement observed a knife in his home following his arrest law, which the government believes is the same knife Elshazly brought with him on December 10, 2019 to meet with CHS 3 during which he was packed and ready to leave the country to join ISIS ) and vehicles—all targets and items easily

15

found around the community.  In light of ISIS's public calls for attacks on American citizens, Elshazly—out of jail but stuck among the citizens of the United States—may shift his cross-hairs and violent tendencies to those around him. As the Second Circuit explained in affirming an order of detention in a similar case:

> [W]here, as here, there is a presumption that defendant cannot be released on any conditions that will ensure the safety of persons or the community, and where that presumption arises because defendant attempted to support a terrorist organization, ISIS, committed to surprise, as well as planned, attacks on United States persons inside, as well as outside, this country, [the defendant] cannot demonstrate that the district court clearly erred in denying him bail because his particular charged crimes sought to support ISIS abroad. Rather, the district court was entitled to conclude that a person in this country who criminally commits to supporting ISIS clearly and convincingly presents a danger to United States persons and communities in this country, as well as abroad.

*Khusanov*, 731 F. App'x at 22–23.

Further signaling the dangerousness of releasing Elshazly is the fact that the charge against him triggers the statutory presumption for detention. As described above, this presumption represents Congressional findings that terrorism offenders are dangerous and likely to continue engaging in criminal conduct, undeterred by federal charges, penalties, or conditions of release.

### F.     The COVID-19 Virus is not a valid basis on which to grant Elshazly pre-trial release.

Elshazly appears to claim that the COVID-19 virus provides a basis for his pre-trial release, notwithstanding that he is both a danger to the community and a risk of flight.  It is not. There is no evidence suggesting that the defendant's particularized health necessitates his release. The Government appreciates the gravity of this global pandemic and is committed to ensuring the safety and health of inmates like the defendant. The United States Attorney's Office has been in contact with the leadership at Wyatt, who have confirmed that they are actively taking steps to reduce the spread of COVID-19 into the inmate population and to ensure the health and safety of

16

the inmates. As set forth above, there are no conditions of release that will reasonably assure the defendant's appearance and the safety of the community and the emergence of COVID-19 does not alter that conclusion.

## V. CONCLUSION

Elshazly has not presented anything new to this Court that warrants his release from detention. This case is the exact type of case Congress identified as appropriate for pretrial detention

Respectfully submitted,

JOHN H. DURHAM
UNITED STATES ATTORNEY

*/s/ Douglas P. Morabito*

DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct20962
United States Attorney's Office
157 Church Street
New Haven, Connecticut 06510
(203) 821-3700
Douglas.Morabito@usdoj.gov

JUSTIN SHER (DC 974235)
DANIELLE ROSBOROUGH (DC 1016234)
Trial Attorney
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
justin.sher@usdoj.gov
Danielle.rosborough@usdoj.gov

## CERTIFICATION

I hereby certify that on June 9, 2020, a copy of the foregoing was filed electronically with the court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                                                */s/Douglas P. Morabito*
                                                DOUGLAS P. MORABITO
                                                ASSISTANT UNITED STATES ATTORNEY