UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | NO. 3:20CR71(VAB) |
| | : | |
| v. | : | |
| | : | |
| AHMAD KHALIL ELSHAZLY | : | August 30, 2026 |

**GOVERNMENT'S SENTENCING MEMORADUM**

The United States of America (the "Government") respectfully submits this memorandum in aid of sentencing in the above-captioned case.

## I. Introduction

In the early morning hours of December 15, 2019, the defendant walked toward a boat on a Connecticut pier with two bags packed and $500 already paid to an individual he believed would smuggle him on a container ship bound for Turkey, to ultimately reach Syria. He thought he was about to realize his longtime dream of traveling to join the Islamic State of Iraq and al-Sham ("ISIS"), to serve as a "mujahid" fighter and potentially achieve martyrdom. He had spent at least fifteen months working toward that moment—saving money, studying how ISIS processes foreign fighters coming over the Turkish border, and pledging and personally leading others in pledging sworn obedience to ISIS's leaders. Once he reached his destination, he believed he would become, in his own words, a "killer" for ISIS. He planned to fight disbelievers, help ISIS seize territory and property, build weapons for ISIS to deploy, and continue spreading ISIS's violent propaganda. He had already spent months attempting to promote ISIS and recruit others to its cause online. Fortunately, he was arrested by the Federal Bureau of Investigation ("FBI") as he walked toward the boat that day, before he could engage in violence on behalf of ISIS abroad.

The defendant did not stumble into this offense. He pursued it, deliberately and unceasingly, for over a year. Each time he thought a door closed for his travel, he sought to open

another—Turkey, then Jordan, then Saudia Arabia under cover of the Hajj pilgrimage, and finally, a smuggler's boat. While he sought out the right opportunity to join the fight on the Syrian battlefield, he was also following ISIS's direction on the digital battlefield by administering a pro-ISIS Discord server[1] where he curated various channels cataloguing and disseminating content produced by ISIS and other jihadist figures, including execution videos, bomb-making guides, and calls for attacks in the West. When the defendant feared he might be stopped before he could leave the country to do in the real world what he had been posting about online, he did not reconsider; he said that he would rather die fighting than be arrested. He wanted to kill "a hundred kaffirs [disbelievers]" abroad rather than only "one, two, three" here in the United States—but he would settle for the latter, if necessary. Indeed, he took direction from ISIS leaders who had publicly instructed ISIS followers like the defendant that if they could not reach Syria, they should "strike" the "kuffar" disbelievers wherever they were.

In the almost seven years since the defendant was arrested and detained, there is no evidence that he has reconsidered these beliefs or deradicalized. Just last year, the defendant was found in possession of a handwritten plan for a coordinated assault on the Wyatt Detention Facility where he is housed—complete with diagrams of the housing unit, instructions for breaching secured areas, and tactics for confronting the Correctional Emergency Response Team. And just several months ago, the defendant was placed in disciplinary segregation for two incidents where

[1] Discord is an online communications platform. As described on Discord's website, Discord servers provide users the "ability to create private, invite-only spaces" where users can communicate and share content. Within servers, there are "channels," which offer smaller forums to communicate on sub-topics. A Discord server can include text channels, which are "dedicated spaces for written conversations," and voice channels, which allow for "voice and video chat." Channels can also serve as repositories for content to be shared and accessed among members of the server. Administrators of Discord servers, like the defendant here, can customize the name, rules of behavior, and welcome screen, as well as link social media or other third-party accounts to their server. *See* "Beginner's Guide to Discord," *available at* https://support.discord.com/hc/en-us/articles/360045138571-Beginner-s-Guide-to-Discord#h_01JYSK9MCP46230RVSPQM7WSM8.

he refused to follow the directions of a correctional officer. When he was ordered to uncover his cell window, the defendant's response was, "Y'all want to go to war? Okay, we will go there."

The evidence of the defendant's offense and of his history and characteristics does not reflect a young man somehow under the influence of others who made a single bad decision that he now regrets. It reflects a defendant who organized his entire adult life around violent jihad, who used every tool available to join and support one of the most, if not the most, violent foreign terrorist organization, and who remains, years later, unrepentant and prepared to use violence against the institution that holds him. Given the grave nature of the defendant's conduct, including his obsessive desire to join ISIS, the sentence in this case must be sufficient to not only protect the public from the defendant now, but to deter his terroristic ambitions in the future. A sentence of 180 months (15 years) of imprisonment and a life term of supervised release is sufficient but not greater than necessary to protect the public, as well as to deter the defendant and others who share his views.

## II. **Factual Background**

As accurately set forth in the description of relevant conduct in the Pre-Sentence Report ("PSR"), from September 2018 through his arrest in December 2019, the defendant knowingly attempted to provide material support and resources to ISIS. Specifically, the defendant plotted to travel to "Sham," the area comprised of Syria and the greater Levant, to fight on behalf of ISIS and under its direction and control. PSR ¶¶ 6–33. During this time, the defendant was fully aware of—and indeed, reveled in—the bloody attacks ISIS had perpetrated in the name of its violent ideology, which targets the United States and other governments, as well as anyone deemed to be a disbeliever. In fact, as he was planning his travel, the defendant helped spread information about

ISIS's terrorist attacks and other ISIS propaganda through the Discord server he administered, to recruit others to ISIS's cause. *Id.* ¶¶ 34–36.

### *1. The Defendant's Knowledge of and Support for ISIS's Terrorist Attacks*

As the defendant was well aware at the time of his offense, ISIS is a militant jihadist group that has conducted and inspired terrorist attacks worldwide, resulting in thousands killed or injured. ISIS has used and continues to use targeted killings, improvised explosive device ("IED") attacks, ambushes, military-style assaults, kidnappings, and suicide attacks to advance its political and military goals in the Middle East, Africa, Asia, Europe, and the United States. *See id.* ¶ 33 (describing ISIS materials found on the defendant's phone following his arrest). The organization also encourages adherents across the globe to engage in terrorist attacks in their own countries using readily available weapons, and it has previously deployed operatives abroad to execute attacks.

At the time of the defendant's radicalization, ISIS was led by Abu Bakr al-Baghdadi, who declared the establishment of an Islamic caliphate in June 2014. Al-Baghdadi was eventually killed on October 27, 2019, during a U.S. military operation. But before that, the defendant pledged his loyalty to al-Baghdadi, *see* Exhibit 1 (redacted Feb. 2019 FBI report), and in March 2019, the defendant guided other individuals through the recitation of the "bay'at" loyalty oath, in which they committed themselves to serving al-Baghdadi and the self-proclaimed "Islamic State" that he ruled. PSR ¶¶ 11, 13. On one of these occasions, the defendant was recorded reciting (in Arabic): "I pledge … when we see clear signs of disbelief for which we would have proof from Allah we pledge fealty to him, for Hijra and Jihad … The Islamic State, the Islamic State, it shall remain and shall expand, Inshallah!" *Id.* ¶ 13. As his ISIS pledge reflects, and as the defendant separately said in a different recorded conversation a week earlier, ISIS and al-Baghdadi directed ISIS supporters to either travel to ISIS-held territory and serve the terrorist organization there—as the

defendant has pled guilty to attempting—or to attack disbelievers in their home countries—as the defendant said he was prepared to do if travel was not an option. *See id.* ¶¶ 12–13.

Over the last dozen years, a frightening number of ISIS supporters like the defendant have heeded this call from al-Baghdadi and other ISIS leaders. According to a U.S. House Report, by 2015, only a year after al-Baghdadi's public announcement of the ISIS "caliphate," more than 25,000 foreigners had traveled to Iraq and Syria and joined ISIS as foreign fighters, including 4,500 people from Western countries and more than 250 individuals in the United States who had traveled or attempted to travel.[2] Other ISIS supporters who did not or could not travel to Syria and Iraq perpetrated numerous deadly attacks in other countries on ISIS's behalf, including the following:

- In November 2015, ISIS members carried out a series of coordinated attacks in Paris that killed approximately 130 individuals and wounded over 400 others.
- In December 2015, two ISIS supporters who were married carried out a shooting at a government building in San Bernadino, killing 14 people and wounding another 21.
- In March 2016, ISIS members conducted two simultaneous attacks in Brussels that killed 32 people, including four U.S. citizens, and injured more than 250 people.
- In June 2016, a gunman who pledged allegiance to ISIS killed approximately 49 individuals and injured 53 others at the Pulse nightclub in Orlando.
- In July 2016, ISIS claimed an attack in which a terrorist driving a cargo truck attacked a crowd in Nice, France during Bastille Day celebrations, resulting in 86 deaths, including three U.S. citizens.
- On October 31, 2017, an ISIS-inspired attacker used a truck to plow through the Hudson River Bike Path in Manhattan, murdering eight people and injuring 13 others before crashing into a school bus. He then got out of the truck shouting, "Allahu Akbar," while brandishing paintball and pellet guns that appeared to be firearms. He was only stopped when he was shot and wounded by a responding

[2] *See* Final Report of the Task Force on Combating Terrorist and Foreign Fighter Travel, U.S. House Committee on Homeland Security, October 2015, *available at* https://www.govinfo.gov/content/pkg/CPRT-114HPRT97200/pdf/CPRT-114HPRT97200.pdf.

police officer. The attacker brought a note in his truck that included ISIS-associated phrases. When he was interviewed following the attack, he told the FBI he had carried it out in response to calls from the ISIS caliph and asked to hang an ISIS flag in his hospital room. He was sentenced to eight consecutive life sentences plus 260 years in 2023.

- On Easter Sunday 2019 in Sri Lanka, more than 250 people were killed, including five U.S. citizens, when ISIS-inspired terrorists carried out coordinated suicide bombings at multiple churches and hotels.

- On November 2, 2020, a 20-year-old ISIS supporter, who had previously pledged bay'at to the ISIS caliph, conducted a mass shooting in Vienna, killing four and injuring another 23 before being shot and killed by police. ISIS claimed the attack. The attacker had been convicted of attempting to travel to Syria to join ISIS and had been granted early release in 2019.

- On March 22, 2024, multiple gunmen conducted an attack at Crocus City Hall, a popular concert venue complex near Moscow, killing approximately 151 people and injuring over 600 others. ISIS claimed responsibility for the attack.

- On January 1, 2025, an ISIS follower perpetrated a deadly vehicle ramming attack in New Orleans, in which he drove a truck into a crowd and killed approximately 14 people and wounded another 57 others.

- On December 14, 2025, two ISIS supporters with assault rifles engaged in a mass shooting and attempted bombing at a Hanukkah celebration at Bondi Beach in Sydney, killing approximately 15 people and wounding over 40 others.

- On March 12, 2026, an ISIS follower who had already been convicted of attempting to provide material support or resources to ISIS in 2017 and had been released from federal custody in 2024, perpetrated a shooting attack at Old Dominion University in Virginia, killing one and wounding two others.

- On July 25, 2026, an ISIS supporter rammed his van into a crowd at Berlin's Pride celebration and then continued his attack with a knife on foot, killing one and wounding 29 others. The attacker had been convicted in 2025 of attempting to join ISIS but had been released.

The list above is not exhaustive, and it does not include the many attacks ISIS has engaged in within Iraq and Syria, including the January 16, 2019, suicide bombing of a well-known restaurant in Manbij, Syria that killed approximately 19 people, including four Americans—two U.S. military uniformed servicemembers, one civilian employee, and one civilian contractor. The

FBI's forensic review of the defendant's cell phone indicates that he had accessed a video[3] showing this gruesome attack in Manbij, and the day after it occurred, he was recorded telling an FBI Confidential Human Source ("CHS-2," as referenced below), "The Dowlah [the Islamic State][4] … they did an istishhad [suicide] attack and they killed four U.S. soldiers … I even have video and pictures for you." CHS-2 asked, "They killed four American soldiers?" and the defendant responded, "Yeah and there were some Kurds around them too, so Hamdillah [praise be to Allah] they got uh, they got those guys as well." Moments later, the defendant added, "We're doing very good in West Africa, by the way … In Nigeria, Niger, Chad, like we have so much territory over there." The defendant was thrilled by ISIS's attacks and territorial expansion, and he believed he ("we") was part of it all.

The defendant was also familiar with the brutal torture and executions ISIS carried out and publicized in its propaganda videos,[5] many of which he accessed online and viewed. The FBI's forensic review of the defendant's devices indicates that he had accessed such ISIS propaganda materials at least as early as May 2018 and that he continued consuming them through the date of his arrest. Below are low resolution "thumbnail" screenshots from just two examples of the ISIS

---

[3] *See* Exhibit 2 at 5 (Cellebrite extraction report for the defendant's cell phone, providing the metadata associated with a video showing the Manbij attack, 5041909404954263668.mp4).

[4] "Dowlah," also transliterated as "Dawlah," is Arabic for "the State" and in the context the defendant used the term, refers to ISIS or the "Islamic State." The U.S. Secretary of State has included "ad-Dawla al-Islamiyya fi al-'Iraq wa-sh-Sham" among the designated ISIS aliases.

[5] Notably, in the months after al-Baghdadi publicly proclaimed the ISIS caliphate in 2014, ISIS released videos depicting the beheadings of multiple individuals ISIS had captured, held hostage, and tortured in Syria, including two U.S. citizens, James Foley and Steven Sotloff, and two British citizens. ISIS also released a video showing the decapitated head of another U.S. citizen, Peter Kassig, in November 2014. And in February 2015, ISIS sent an email to the family of another U.S. citizen ISIS had taken hostage and then murdered, Kayla Mueller, confirming her death.

propaganda depicting executions that the defendant viewed on his cell phone, which he accessed on August 1, 2018 (left), and October 6, 2019 (right), based on the associated metadata[6]:





***2. The Defendant's Radicalization and the Initiation of the FBI's Investigation***

The FBI opened its investigation of the defendant in September 2018, after he began communicating online with an FBI CHS ("CHS-1"). On September 4, 2018, the defendant told CHS-1 that he wanted to travel to "sham," "but the rout [sic] is closed." He added that "dowlah [ISIS] will take it back inshallah in less than 10 years." PSR ¶ 8. Five days later, the defendant told CHS-1 that he "liked al qaeda…But [in] 2014 saw dowlah on tv…[s]o I was like yes finally the Muslim have gotten power." He went on to describe how his support for ISIS ("cilapha") evolved:




[6] *See* Exhibit 2 at 4 (Cellebrite extraction report for the defendant's cell phone, providing the metadata associated with these files, 438912837_143019.jpg and VID_20190320_195836.mp4).

On October 1, 2018, the defendant told CHS-1 that there are "[o]nly 3 things they can arrest you [for] 1 planning to join 2 planning a terrorist attack 3 [s]ending money … these things classif[y] as material support … so stay away from these things." Exhibit 3 (Defendant's Oct. 2018 messages). It was clear over a year before his arrest that the defendant understood precisely what conduct the law prohibited and he pursued it anyway in his fanatical drive to support ISIS.

### *3. The Defendant's Sustained Efforts to Join ISIS*

Although the defendant cut off contact with CHS-1 in early 2019, presumably fearing that CHS-1 was a government informant, the defendant was also communicating with a different CHS ("CHS-2"), who worked with the defendant and whom the defendant quickly began trying to recruit to ISIS. PSR ¶¶ 8–9. In a meeting with CHS-2 on January 17, 2019—the same meeting where he gushed about ISIS's deadly attack in Manbij—the defendant lamented that he may have missed his chance to go to Syria to fight. He explained that it had been possible to travel to ISIS-held territory in Syria by transiting through Turkey, where individuals who wanted to be foreign fighters like him would be interviewed, vetted, and then formally enlisted into the terrorist organization. *Id.* ¶ 9. But he was not sure that path was still viable and he was actively searching for alternatives. By February 2019, the defendant had saved approximately $1,000 with the intention of traveling to Syria through Jordan, although he told CHS-2 that he had become convinced that route, too, might be blocked. *Id.* ¶ 10. Then in March 2019, the defendant said that he planned to get to Syria through Saudi Arabia by falsely claiming he was making the Hajj pilgrimage. *Id.* ¶ 14. He continued to look for the right route as the year went on, but it was clear that he would seek out an opportunity to kill for ISIS somehow, someway. He would not give up on his bay'at oath to travel abroad or engage in violent jihad in the United States.

In March 2019, the defendant downloaded and set up the Discord application on CHS-2's phone, then invited CHS-2 to join a group chat with sixteen other participants. *Id.* ¶ 10. The defendant's online moniker in this group was "Garib," translated as "stranger," which the defendant said he adopted because he did not belong in America. *Id.* ¶ 11. In a voice call with other members of the group, the defendant led another individual through the bay'at pledge as described above. After completing the pledge, the defendant spoke at length about what the oath meant, saying, "we have to do this to help ISIS with whatever we can," "if we can fight, we fight," "we should give money if we can," and "ask God to help them." During his speech to the group, the defendant repeatedly said, "Our brothers are dying, we either win or die." Exhibit 4 (redacted Mar. 2019 FBI report).

***4. The Defendant Seizes an Opportunity He Believes Will Get Him to ISIS in Syria***

On September 2, 2019, the defendant saved a digital recording[7] of himself singing a "nasheed," a vocal song or chant, which captured his unrelenting drive to fight on behalf of ISIS ("dowlah") and the fear he hoped to inspire among ISIS's enemies:

> So what will you do when the time comes
> When dowlah is coming after you
> The soldiers of the Khalifa unite
> Upon the battlefield
> To give the Kuffar a fright
> Run and hide as you may
> You may get away from us
> But nay from Allah
> So what will you do when your time comes
> Upon the earth
> While you see your knives come out from thee
> And Allah bestows upon thee a punishment so great
> You wish you were never born—existed at all
> A punishment so great
> And there is no escape

[7] *See* Exhibit 2 at 6 (Cellebrite extraction report for the defendant's cell phone, providing the metadata associated with his nasheed recording, MOV_20190902_1441105.mp4).

Just over two weeks later, CHS-2 introduced the defendant to another individual ("CHS-3"), whom the defendant believed could help him travel across the Turkish-Syrian border. The defendant met with CHS-2 and CHS-3 on October 15, 2019, and during this recorded interaction he stated, "…they say, war has started and we are marching to it… War has started and we are marching to it. This is their strength and I say the same thing, and I say it but all doors are closed, closed. I am talking to myself now, asking myself, how do I get there? How can I help Muslims? How can I do anything?" He went on: "God willing! May this country burn the same way they burned Muslims! May they burn in fire at the end!" PSR ¶ 15.

As he explained, the defendant's motivation to travel was based on his motivation to maximize the body-count of his violent jihad. In this same recorded meeting, the defendant stated, "I want to go to the caliphate and fight there. I can kill maybe…like a hundred kaffir [disbelievers]. I can kill them. A hundred kaffirs. If I do something here how many kaffirs could I kill? One, two, three and then I get shot and I die. It is more benefitting if I go there, I could kill more and will get more faithful rewards." *Id.* ¶ 16. The defendant's drive to kill disbelievers for ISIS was based on his deeply held beliefs about jihad: "And do not think that the believer, who goes out and fights and the believer who stays behind are equal … The mujahid [one who engages in jihad] who fights for the sake of Allah, is greater … There is no doubt, there is no doubt." *Id*. After the defendant met with CHS-3 and believed CHS-3 might offer a path to join ISIS, he told CHS-2, "This is the best day of my life! The only thing that's gonna top this is when I get into Sham."

The defendant remained committed following al-Baghdadi's death less than two weeks later. In an online communication with CHS-3 the day after al-Baghdadi was killed, the defendant stated, "I want to leave before I lose my chance [t]o defend the ummah [Muslim community]." *Id.* ¶ 17. Three days after that, the defendant told CHS-3 that in Syria, he intended to be "a killer,

Inshallah." *Id.* ¶ 19. Discussing his fear of being stopped as he tried to leave the country, the defendant said he would fight at the airport if he had to. *Id.* He sent CHS-3 a photograph of his passport later that day. *Id.* ¶ 20. And the next day, the defendant sent CHS-3 a sworn pledge of allegiance to the new leader of ISIS, who had succeeded al-Baghdadi. *Id.*; Exhibit 5 (defendant's October 31, 2019, bay'at oath).

The defendant's eagerness to travel did not let up, and on December 6, 2019, he told CHS-2 that CHS-3 had to way to get the defendant out of the United States and that he was sure he wanted to go. PSR ¶ 22. That same day, the defendant also sent CHS-3 a series of YouTube videos titled, "How an AK-47 Works," "AK-47 - How this rifle works! (Animation)," "M16 and AR-15 - How firearms work! (Animation)," "How a gun (Colt M1911) works! (Animation)," "How an RPG 7 works," "How a Grenade Works," and "How gun [sic] works: All you need to know about bullets (how it's [sic] work) - Animation ..." The defendant also sent a document titled: "Guns & How They Work By Ian V Hogg: Free Download, Borrow, and Streaming: Int...," telling CHS-3, "This PDF has a lot of guns and how they work," "We should make our own guns," and "Their [sic] would be a huge advantage to making a fun [sic] with a tapered barrel." And the defendant sent more videos overnight regarding how to make rockets. *Id.* ¶ 23.

On December 10, 2019, the defendant drove almost an hour to meet in person with CHS-3. He said that he could build heavy weaponry similar to that featured in the numerous videos he had sent:

> We could build this stuff. It's not that hard. It's not that hard. We need easy access to materials. If we're gonna build something, has to be some place like Turkey we build it, where we can get the parts easily. Then once we get the parts and we build the prototypes of whatever, whatever weapon we want to develop, then we go into Sham with it. We can smuggle it into Sham either way. And then we can test it out there. I mean, it's not that hard. Like, the MANPADs

> [man-portable air defense systems], the specific, the specific systems…

Just after this, the defendant reiterated that he had his bags and he was "ready to go." He said that he could either get to Turkey and stay there to design weapons or, if ISIS preferred, he could go straight to fighting. *See id.* ¶¶ 26–27.

He then asked CHS-3 if he could "leave today," saying, "if I could leave today, I want to leave today." CHS-3 responded that the defendant needed to wait and take a breath, and that traveling had to be the defendant's considered and sincere decision. CHS-3 told the defendant that if he wanted to stay, for his mother or otherwise, he should stay. CHS-3 also said that sometimes people go and then change their minds because of "the life…the war…hot, cold, dusty, less food, less stuff. They say, 'You know what, I want to go stay with my family.'…Even now if you told me, 'You know, my mom, she doesn't want me to go,' or your dad, or, your decision, that's good, no problem. We're still friends." CHS-3 went on to reiterate, "There's nobody pushing you for this," but the defendant said, "Just send me straight to Sham. I can fight." Shortly after meeting with CHS-3 that day, the defendant sent a series of messages confirming that he wanted to travel, including with a quote he cited from the Koran that has also been featured in ISIS propaganda the defendant shared on Discord: "kill them wherever you find them…" *Id.* ¶ 29.

Although he was eager to travel as soon as possible, the defendant was still reluctant to travel by air, since he said that in 2017, he had sent a picture of his passport to a person describing himself as an ISIS fighter in Sham. He was worried that his passport might have been made known to authorities since then, and that he would be apprehended at the airport. *Id.* ¶ 28. But the defendant thought that he could still leave the United States by boat. CHS-3 introduced the defendant to another individual ("CHS-4"), who told the defendant that it would cost $500 to leave and the defendant replied, "I have it cash already, so I'm ready." *Id.* ¶ 31. The day before his arrest,

the defendant met with CHS-4 and provided five $100 bills. CHS-4 explained that the money would be used to pay for the defendant's transportation on a fishing boat, and then a larger container ship that was bound for Turkey. CHS-4 told the defendant that CHS-3 would be waiting for the defendant once the container ship arrived to help him complete his journey to Sham. *Id.* ¶ 32.

The following day, December 15, 2019, the defendant traveled to a predetermined meeting area almost an hour from his home to wait for CHS-4. On his way there, as confirmed by information extracted from his cell phone, he watched an ISIS propaganda video that showcased ISIS fighters and executions, again confirming his ultimate purpose.[8] Once he was there and CHS-4 arrived, the defendant moved his two bags to CHS-4's vehicle. CHS-4 then drove the defendant to a nearby marina and pointed out a particular individual who would transport him on a fishing boat. As the defendant walked toward that individual with his belongings, he was arrested. *Id.* ¶ 33.

***5. The Defendant's Creation and Administration of a Pro-ISIS Discord Server***

At the same time he was plotting out his path to join ISIS's bloodthirsty army overseas, the defendant was working from here in Connecticut to serve ISIS by spreading its propaganda online. In particular, the defendant established and administered a pro-ISIS server on Discord, including with channels titled "Kuffar," "Live Streaming Dawlah," and "Cyber Security," among others. Based on records obtained by the FBI, approximately 20 individuals had access. As an example of the content that the defendant curated and disseminated, the defendant's server had channels titled "military-things," "military-knowledge," "spy-awareness," and "dawah-pdfs," where the

[8] *See* Exhibit 2 at 6 (Cellebrite extraction report for the defendant's cell phone, providing the metadata associated with the ISIS propaganda video the defendant watched on he drive, VID_20191215_051530.mp4).

defendant posted dozens of ISIS-related documents, including: (1) a 133-page ISIS text titled "Knowledge Series, Clarifying Matters of Methodology" by the Delegated Committee of the Khilafah [caliphate]; (2) an ISIS brochure titled, "This is our Adiqah [creed] and this is our Methodology"; and (3) a 10-page speech titled, "Be Patient, For Indeed The Promise of Allah is True" by the former ISIS spokesman, Abu Muhammad al-Adnani. *Id.* ¶¶ 34–35.

The defendant also used his Discord server to post hundreds of ISIS and other extremist propaganda memes and videos, as did other members of his server. Below are just a handful of memes the defendant posted:













Many of the defendant's posts also featured positive news coverage of ISIS attacks, including from the Amaq News Agency, an official ISIS media entity. For example, he posted

ISIS news items with descriptions like, "The soldiers of Khilafah targeted with machine guns a vehicle transporting members of the Murtadd PKK in the town of Kushkiah which resulted in killing two of them, and all praise is due to Allah," and, "By the grace of Allah, the security detachment of the Khilafah solider [sic] managed to detonate two explosive devices on a 4-Wheels drive vehicles in the town of #Hajin 2 days ago, which resulted in disabling it and killing four members were on board including a commander, and all praise is due to Allah." These were attacks in Syria, where the defendant was striving to travel and in which he would hopefully take part. Along with news of another ISIS attack in Manbij that he posted, the defendant wrote, "they can feel the heat now. Talking about Khilafa being defeated when their [sic] blowing you up." In another channel, the defendant preached, "You have to fight for the sake of Allah, for it is, one of the gates of Paradise! For Remember that Allah Rewards those who are steadfast, through the trials, and tribulations! #Jihad #Khilafa #Baqiah [Enduring]." *Id.* ¶ 36.

### *6. The Defendant's Numerous Disciplinary Infractions Following His Arrest*

As the PSR indicates, the defendant has had disciplinary violations on 15 separate occasions since his arrest, all but one of which occurred over the last two and a half years. *Id.* ¶ 5. In just a three-month period in 2024, the defendant was disciplined for assault, fighting, interfering with safety and security, and a threat intended to cause fear against an officer, which was serious enough to result in 60 days of disciplinary segregation. Later that year, he received another 30 days of disciplinary segregation for attempting to assault correctional staff through the food slot of his cell door, then blocking his window and barricading his food slot once emergency response officers arrived. He had three other infractions over the next nine months resulting in a total of 55 more days of disciplinary segregation.

In August 2025, officers searching the defendant's cell found handwritten plans to organize an uprising among other inmates. *See* Exhibit 6 (under seal). The plans include maps of the facility and directions on how to resist correctional officers. Part two of the defendant's plans, under the heading, "Reck Shit," called for the destruction of computer equipment, cameras, and other property using "tough things" like "laundry stands" and a "metal bar." This incident resulted in another 60 days of disciplinary segregation.

And in 2026, the defendant has spent another 40 days in disciplinary segregation due to three more infractions, including a fight with another inmate in January and his shout about "go[ing] to war" while refusing to comply with the direction of a corrections officer in April. In sum, almost seven years after his arrest, his disciplinary record in detention reflects a continued willingness to use violence rather than any deradicalization or moderation.

## III. Procedural Background and the PSR

On December 15, 2019, the defendant was arrested and charged by complaint with attempting to provide material support and resources to ISIS, a designated foreign terrorist organization, in violation of 18 U.S.C. § 2339B. Doc. No. 1. The next day, the defendant made his initial appearance and was ordered detained. Doc. No. 4. He moved for release on bond in February 2020, April 2020, May 2020, and August 2022, and those motions were denied. Doc. Nos. 17–18, 31, 37, 56, 132, 140. In the magistrate judge's detention order of February 13, 2020, which the Court reviewed *de novo* and affirmed, the magistrate judge found that the Government established the defendant's dangerousness by clear and convincing evidence, namely:

> …the defendant has consistently indicated a clear desire to kill other people on behalf of ISIS and has held himself out as someone who is computer savvy, who can build computer systems, who uses encrypted applications, who has used fake phone numbers and multiple SIM cards and who teaches others how to navigate computer applications to evade law enforcement detection. He

> himself led an online chat group which had as its purpose a pledge of allegiance and loyalty to ISIS, which translated to the killing of those who disagreed with the members' beliefs. The defendant has collected and distributed extremely disturbing and grotesque videos depicting the beheading of hostages, the drowning of hostages, the killing of hostages by sniper rifles, the killing of soldiers by the use of roadside bombs, and the dismembering of hostages. The defendant has warned others that these kinds of acts of violence result when an individual challenges or goes against ISIS. To the extent that there is a suggestion that the defendant's own words were not meaningful and not indicative of violent behavior, his actions corroborate the words, in that there were three instances of him engaging with total strangers simply because he felt that something about their appearance or attitude was an afront to his beliefs. And, far more significantly, the defendant made plans, in this case, to take a boat to Turkey to join ISIS in the fight in Syria.

Doc. No. 18 at 1. The defendant has remained detained since his arrest.

On May 20, 2020, the defendant was indicted for attempting to provide material support and resources to a designated foreign terrorist organization, in a violation of 18 U.S.C. § 2339B. Doc. No. 48. On March 15, 2021, a superseding indictment was returned charging the defendant with two counts of attempting to provide material support and resources to a designated terrorist organization, in a violation of 18 U.S.C. § 2339B. Doc. No. 83. In count one of the superseding indictment, the defendant is charged with attempting to provide "personnel," namely himself, to ISIS in relation to his attempted travel. In count two, the defendant is charged with attempting to provide "services," by administering chat rooms and a server to distribute propaganda and recruitment materials, in relation to his activities online, as described above.

On November 30, 2022, the defendant entered a plea of guilty to count one of the superseding indictment, pursuant to a plea agreement. Doc. No. 153. Over the next three and a half years, the defendant moved to continue his sentencing hearing multiple times. *See* Doc. Nos. 156, 162, 167, 171, 174, 181, 184, 187, 190, 194, 198, 207, 214. He faces the following statutory maximum penalties: a term of imprisonment of 20 years, a life term of supervised release, a

$250,000 fine, and a $100 mandatory special assessment. In the plea agreement, the defendant agreed to waive his right to appeal any sentence that does not exceed 15 years of imprisonment. *See* Plea Agreement, Doc. No. 154, at 7; PSR ¶ 94. He also agreed that his offense involved, or was intended to promote, a federal crime of terrorism and that the application of the Federal Sentencing Guidelines (the "Guidelines") resulted in an adjusted offense level and Criminal History Category pursuant to U.S.S.G. § 3A1.4(a) & (b). *See* Plea Agreement at 5. And he agreed to forfeit his interest in certain items listed in the plea agreement. *See* Plea Agreement at 3.

The PSR correctly calculated the defendant's offense level and Criminal History Category under the Guidelines as follows, *see* PSR ¶¶ 41–55: The defendant's base offense level under U.S.S.G. § 2M5.3(a) is 26. Two levels are added under U.S.S.G. § 2M5.3(b)(1)(E), since the defendant's provision of material support and resources was with the knowledge, intent, or reason to believe that they would be used to commit or assist in the commission of a violent act. The PSR included the application of U.S.S.G. § 3A1.4(a) and (b), which added 12 offense levels and automatically placed him in Criminal History Category VI. And three offense levels are subtracted for the defendant's acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) & (b). As a result, the PSR concluded that the defendant faces a total offense level of 37, which results in a Guidelines range of 360 months to life imprisonment, but because of the statutory maximum, the Guidelines range becomes 20 years (or 240 months) of imprisonment. PSR ¶ 88. He also faces a Guidelines fine range of $40,000 to $250,000. *Id.* ¶ 99.

Pursuant to the plea agreement, the defendant and the Government have agreed that the Government will not seek a sentence of imprisonment greater than 15 years. The parties also agree that a life term of supervised release should be imposed, and that the parties will jointly request that the Court impose a life term of supervised releasee. Plea Agreement at 5; PSR ¶ 93. The parties

further agreed that after sentencing, the Government would move to dismiss count two because the conduct underlying that count—his creation and administration of an online server and chat rooms to distribute ISIS propaganda and connect with other ISIS supporters—will be taken into account in determining an appropriate sentence. Plea Agreement at 9.

## IV. Discussion of Sentencing Factors

As noted above, the Government respectfully requests that the Court impose a sentence of 180 months (15 years) of imprisonment and a life term of supervised release. Such a sentence reflects the nature, circumstances, and seriousness of the offense; promotes respect for the law; and provides just punishment for the offense, while also protecting the public and affording adequate deterrence to future criminal conduct, and it will take into account the defendant's history and characteristics, including any mitigating circumstances. *See* 18 U.S.C. § 3553(a).

### A. The U.S.S.G. § 3A1.4 "Terrorism" Enhancement Should Receive Due Deference

In the plea agreement, the parties agreed that the Guidelines calculation included application of U.S.S.G. § 3A1.4. *See* Plea Agreement at 5. Notwithstanding the defendant's agreement that the application of U.S.S.G. § 3A1.4 is correct, he argues that the Court should ignore it because, in his view, U.S.S.G. § 3A1.4 is flawed and merits no deference. *See* Doc No. 222-1 ("Def.'s Mem.") at 26. The defendant's arguments are without merit.

U.S.S.G. § 3A1.4 is a congressionally directed guideline that reflects the particular challenges of rehabilitation and recidivism, and the danger to the community presented by defendants convicted of terrorist crimes like the defendant's offense here. The Second Circuit has considered the reasoning behind U.S.S.G. § 3A1.4 and has held that "Congress and the Sentencing Commission had a rational basis for creating a uniform criminal history category for all terrorists under § 3A1.4(b), because even terrorists with no prior criminal behavior are unique among

criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003) ("the Guidelines are in no way irrational in setting the default for criminal history at a very high level, with downward departures permitted in exceptional cases."). This is true even if a defendant did not or could not ultimately achieve his goal of fighting for ISIS abroad. As the Second Circuit explained:

> We conclude by underscoring that the Guidelines, while only advisory appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal. Moreover, when it comes to sentencing terrorism, Congress and the United States Sentencing Commission plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences. Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors.

*United States v. Mumuni Saleh ("Mumuni")*, 946 F.3d 97, 112–13 (2d Cir. 2019) (internal quotations, citations, and alterations omitted).

More recently, the D.C. Circuit echoed this finding following a government appeal, holding that a district court's below Guidelines sentence of 28 years was substantively unreasonable for a defendant convicted of conspiring to provide and providing material support to terrorists who attacked the U.S. diplomatic mission in Benghazi, Libya (and destroying property and using a firearm in the process), but acquitted of multiple murders and attempted murder. *United States v. Khatallah*, 181 F.4th 1276 (D.C. Cir. 2026). As the D.C. Circuit panel explained in *Khatallah*, the district court errored by varying from the Guidelines (after application of the terrorism enhancement) on the basis that the jury found "no one was harmed" by the defendant's conduct.

*Id.* at 1290 (*citing Mumuni*, 946 F.3d at 112–13). The terrorism enhancement does not require "realized harm to a person" and it "encompasses inchoate offenses" where "the intended harm is never realized," such as with respect to the defendant's attempt to travel abroad to join ISIS here. *See id.*; *United States v. Abu Ali*, 528 F.3d 210, 264–65 (4th Cir. 2008) ("[W]e cannot wait until there are victims of terrorist attacks to fully enforce the nation's criminal laws against terrorism. … [T]he lack of completion in this case should not be taken to indicate any change of heart by the defendant. … Thus, the defendant should not benefit simply because his plans were disrupted by [] officials before he could see them through." (internal quotations omitted)). Similarly here, the fact that the FBI thwarted the defendant's aims to kill for ISIS before he could achieve them does not support a variance further below the 180-month sentence requested by the Government.

Finally, even if application of the terrorism enhancement could produce a debatable sentencing range in some hypothetical case (which the government does not concede), this is not that case. As discussed above, the defendant's deeply entrenched jihadist views suggest that the concerns about recidivism that motivated Congress and the Sentencing Commission are well placed. Moreover, the Guidelines range resulting from the terrorism enhancement is capped in this case based on the statutory maximum, not to mention the below Guidelines 180-month sentence the Government seeks. Without the statutory maximum applicable here, the defendant would face a Guidelines range of 360 months to life imprisonment. PSR ¶ 88. So the Government's requested sentence is already 50% lower than the bottom end of the defendant's otherwise applicable Guidelines range, and 25% lower than the Guidelines as limited by the statutory maximum.

**B. The Section 3553(a) Factors**

***1. Nature and Circumstances of the Offense***

The offense in this case is of an extremely grave nature, which is reflected in a Guidelines calculation that exceeds the statutory maximum sentence. The defendant's clear intention to join ISIS and the fervor in which he sought to engage in violence as part of a radicalized view of Islam reflect that he has been fully radicalized in a process that cannot be easily unwound. The numerous hours of recordings collected by the FBI and the voluminous amounts of pro-ISIS materials found on his devices and on the Discord server he administered depict a man with a sharp focus on ISIS and terrorism, at least since 2017. By late 2018, joining and supporting ISIS predominated his thoughts and actions, and there is no evidence to suggest that his mindset has fundamentally changed in recent years. Unfortunately, the evidence of the defendant's conduct indicates that he does not want to be a part of this country, and instead actively wants to destroy it and kill the "kuffar" who live in it.

At least twice, he has sworn loyalty and allegiance to ISIS, an organization that has expressed its will to seize territory and property through violence and coercion. He pledged obedience knowing that ISIS summarily executes its perceived enemies, subjugates and abuses women and children, and targets civilians and civilian infrastructure in an effort to terrorize and control people through fear and violence. These are the activities that he was ready to participate in once he reached ISIS in Syria. And there is no evidence that the defendant has renounced his previous oath to this organization or its goals.

Although he was stopped from traveling, the defendant also demonstrated his support for ISIS by spreading ISIS's violent ideology online and recruiting others to walk his same path. Most disturbingly, he consumed, catalogued, and shared large amounts of ISIS propaganda—which

often contained violent images of individuals injured or killed by ISIS attacks, ISIS prisoners, and videos depicting beheadings and attacks against U.S. or Coalition forces. The videos and images the defendant shared of ISIS prisoners having their throats slit and heads slowly severed are repulsive and sickening, yet the defendant was apparently invigorated by these gruesome depictions of violence and death. He wanted to be part of it, again, consistent with his oath.

While the defense suggests that the defendant was primarily motivated by his desire to "protect[] women and children in Syria from harm," Def.'s Mem. at 4, that claim is belied by the numerous statements he made and ISIS materials he disseminated glorifying ISIS's campaign of death and destruction on all perceived disbelievers—including other Muslims, such as the Kurds and Shia whom ISIS's former spokesman called "rafidah" (rejectors) in propaganda materials defendant posted online. The defense also characterizes the defendant's efforts to research weapons systems that he said he would seek to build once abroad as "magical thinking," *id.* at 12, but regardless of how achievable the defendant's plans might have been, they reflect his true intention to help ISIS expand its caliphate by force rather than any supposed desire to defend the innocent.

Finally, contrary to defendant's suggestion that he would not have committed the offense "absent the encouragement and support of government CHSs," *id.* at 10, the record demonstrates that he had been working assiduously to find an opportunity to join ISIS well before interacting with any of the CHSs here—indeed, he said that he had communicated about joining ISIS with an individual who said he was an ISIS fighter in Sham in 2017, the year before meeting CHS-1—and at no point did the defendant hesitate when he thought he had found such an opportunity thereafter. The evidence in this case also reflects that the defendant had multiple opportunities to say "no"—to say that all he wanted to do was to spread ISIS propaganda, or that he did not actually want to

travel overseas and be a "fighter." He tried to leave immediately on December 10, 2019, but CHS-3 told him to wait, to consider his mother, father, and how difficult life could be in Syria. But he blew right through that and other offramps, rejecting any alternative path. When he found what he believed was the chance he had been looking for to get to Syria after meeting with CHS-3 in October 2019, he said it was the "best day of my life." He said he wanted to be a "killer" once he got there. And he said he wanted to build weapons for ISIS, improve their network capabilities, and increase their capacity to spread propaganda to recruit more individuals. Of significant concern, the defendant suggested that if he could not succeed in traveling to fight for ISIS abroad, he would engage in a violent attack on the homeland, consistent with his bay'at oath. These were the defendant's deep-seated intentions, not things implanted by any CHS, and it was only because of law enforcement's intervention that he did not find a real chance to carry them out.

### *2. History and Characteristics*

The most important characteristic of the defendant for purposes of sentencing is his extreme radicalization, as reflected in his conduct as described in the PSR and above. The defense has provided evaluations from two psychologists, but one of those psychologists, Dr. Baranoski, was not provided the PSR—and therefore lacks the necessary context to properly opine on the danger the defendant presents. Dr. Baranoski is relying primarily on her two examinations, totaling under 7.5 hours. *See* Doc. No. 222-2 (Baranoski Report) at 2–3. And the other defense psychologist, Dr. Schouten, has reviewed the PSR, but appears to have based his opinions on a fundamental misunderstanding of the factual record when he suggests, inaccurately, that the defendant has not sworn bay'at to ISIS; that there is no "evidence that he has expressed a desire for martyrdom"; and that he "does not appear to be motivated by strong ideology." Doc. 222-3 (Schouten Report) at 12. The fulsome record of the defendant's extreme ideological commitment,

consistent with the bay'at oath he personally swore to two different ISIS caliphs and also led other individuals in swearing, reflects his strong ideological motivations that will not easily be deterred. The Court should appropriately discount the opinions offered by Drs. Baranoski and Schouten as to the defendant's dangerousness and potential rehabilitation given their limited and, at least in Dr. Schouten's case, inaccurate view of the factual record as it relates to the defendant's radicalization.

The defendant's argument for a time-served sentence is based on the same misconception, as well as the defendant's argument that his offense conduct is based on the late-breaking finding by Dr. Baranoski that the defendant "has significant characteristics associated with [autism spectrum disorder] in the mild to moderate range." This new finding only arrived at in the run-up to this hearing leads Drs. Baranoski and Schouten to conclude that additional confinement is not necessary to rehabilitate the defendant or prevent his recidivism. Def.'s Mem. at 15–16. Even if the Court were to accept the accuracy of such a diagnosis only arrived at for the purposes of sentencing, and for which the defendant was never previously diagnosed or treated in the first 28 years of his life, it actually makes the defendant *more* of a recidivism concern, not less. By the defense's own account, the defendant's test results generally indicate average cognitive capabilities, but autism makes him particularly susceptible to ISIS propaganda he encountered online. *Id.* at 15. Moreover, he appears unreceptive to treatment and medication, which makes these recidivism concerns even greater. *See* Baranoski Report at 12 ("When asked if he would be willing to try medication, [the defendant] was adamant he is not depressed and does not want medication."); *id.* at 17 (the defendant "expressed little interest in medication. … Getting [him] to accept therapeutic interventions will be a challenge."). In other words, the defendant's history and characteristics actually weigh in favor of a *longer* carceral sentence given that he will continue to be a heightened danger of continued radicalization in an unstructured environment.

The PSR also reflects that the defendant faced challenges as a child and was the product of a complicated family situation after his parents' separation at a young age. But as the letters submitted by his parents also make clear, he was fortunate to have had two parents who loved him, even though they now regret helping contribute to the environment that helped set the stage for his later radicalization. And while it is encouraging that they have expressed their willingness to support the defendant after sentencing, unfortunately his extreme radicalization into adulthood and commitment to an ideology he has still not explicitly renounced makes him a continuing danger to the community.

### 3. *Protecting the Public and Affording Adequate Deterrence to Future Criminal Conduct*

Individuals may join ISIS for different reasons, but the record here reflects that the defendant attempted to join because he believes in ISIS at his core and is ready to die and kill for the terrorist organization and its cause. It is the defendant's fervor that makes him so dangerous and so long as he remains radicalized, the defendant poses a grave threat to the public. If the defendant acts on his radical beliefs, violence will inevitably follow. The scope of violence will only be dictated by how committed the defendant remains. As attacks all over the world have shown, terrorists can inflict significant death and damage without access to significant funds or weapons—vehicles, knives, and other accessible items can serve as deadly weapons for a committed attacker. If he remains the same ISIS-obsessed and devoted follower he was in 2019 and still appears to be today, he has the potential to inflict serious harm on the public. Indeed, the attack at Old Dominion University this year was carried out by an ISIS supporter who had been arrested in 2016 and released from federal custody at the end of 2024. *See United States v. Jalloh*, 15-CR-00163 (AJT) (E.D. Va.). Like the defendant here, Jalloh pled guilty to attempting to provide material support and resources to ISIS. But less than a year and a half after his release, he

perpetrated an attack where he killed one and injure two others before he was stopped. As long as the defendant remains radicalized, such a turn of events will always be a risk when he is released from prison.

A 180-month prison sentence will not only protect the public from the defendant, it will provide the defendant with a significant deterrent for future criminal conduct. While the defendant is young and 180 months is a significant sentence, he must understand how serious his conduct is and—regardless of whether he respects the rule of law in the United States—he must understand that his conduct will have serious consequences. If the defendant were to engage in similar conduct in the future, he may spend the rest of his life in prison.

***4. The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Avoid Unwanted Sentencing Disparities***

The defendant's offense could not be more serious, short of succeeding in his plan to fight and kill for ISIS. The Government's requested sentence of 180 months of imprisonment satisfies the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. It also would be in line with the sentences in numerous other cases involving defendants who traveled or attempted to travel to fight for ISIS and other foreign terrorist organizations, including cases involving defendants of a similar age to the defendant here. Courts have imposed significant sentences of imprisonment in such cases, including recently in this District in *U.S. v. McCormick*, 19-CR-00263 (KAD) (D. Conn.) (Jan. 16, 2024), a case involving a defendant in Hamden who communicated with FBI CHSs about traveling

to reach ISIS in Syria less than two months before the defendant here was arrested. Below is a sample of sentences imposed in a number of these cases[9]:

- ***U.S. v. Tounisi,* 13-CR-00329 (ARW (N.D. Ill.) – 180 months:** Tounisi made plans to travel to Syria to join the Al-Nusrah Front ("ANF") in 2012, when he was 18 years old. Tounisi visited a purported recruitment website for ANF and emailed the listed contact person, who was actually an FBI employee. Tounisi was later arrested at O'Hare International Airport in 2013 attempting to board a flight to Turkey and pled guilty to one count in violation of section 2339B. The Seventh Circuit affirmed Tounisi's 180 month sentence—the statutory maximum available at the time—as substantively reasonable. *United States v. Tounisi*, 900 F.3d 982 (7th Cir. 2018).

- ***U.S. v. Bell*, 13-CR-00141 (TJC) (M.D. Fla.) – 240 months:** Bell conspired with two other individuals to travel to fight for Ansar al Sharia in Yemen in 2012, when Bell was 19 years old. Bell and one of the individuals traveled to Jordan, where they were stopped and returned to the United States. At sentencing, Bell argued that his "childhood was marred by rejection, divorce, adultery, substance abuse and family violence," and suggested that he should have received screening for a learning disability and ADHD when in school. *See id.*, Doc. No. 52. Bell pled guilty to two counts in violation of section 2339A and was sentenced to 180 months for one of the counts and 60 months for the other, to run consecutively.

- ***U.S. v. Elfgeeh*, 14-CR-06147 (EAW) (W.D.N.Y.) – 270 months:** Elfgeeh helped prepare two other individuals, both of whom were cooperating with the FBI, who represented that they were planning to travel to Syria to join ISIS. Elfgeeh also sent money to an individual overseas who indicated he was attempting to travel to Syria, and he and sought out firearms from one of the FBI cooperators. He pled guilty to two counts in violation of section 2339B and was sentenced to 180 months and 90 months to run consecutively.

- ***U.S. v. Dandach*, 14-CR-00109 (JVS) (C.D. Ca.) – 180 months:** Dandach was arrested at the John Wayne Airport in Orange County attempting to board a flight to Turkey in an effort to join ISIS in Syria, when he was 20 years old. At sentencing, he pointed to mitigating factors including the separation of his parents and his childhood in a home with domestic violence. *See id.*, Doc. No. 131. Dandach pled guilty and was sentenced to 180 months for his violation of section 2339B and 120 months for his related passport fraud, to run concurrently.

[9] For cases involving charged conduct prior to June 2015, the maximum penalty for a single count of 18 U.S.C. § 2339B was 15 years of imprisonment. In June 2015, the maximum penalty increased to 20 years of imprisonment.

- ***U.S. v. Ahmed, et al.*, 15-CR-00049 (MJD) (D. Minn.) – 180 months:** Ahmed was arrested at JFK International Airport attempting to fly overseas and join ISIS when he was 19 years old. He pled guilty to violating section 2339B and a financial aid fraud charge and was sentenced to 120 months and 60 months, respectively, to be served consecutively. Two of Ahmed's co-defendants, who also attempted to travel but were juveniles at the time of their conduct, pled guilty and were sentenced to 120 months.

- ***U.S. v. Juraboev, et al.*, 15-CR-00095 (WFK) (E.D.N.Y.) – 180 months:** Juraboev, then 24 years old, and his co-conspirator, Saidakhmetov, then 19 years old, discussed traveling to join ISIS in Syria and indicated that if they were unable to travel, they would carry out an attack in the United States. Saidakhmetov was arrested at JFK International Airport attempting to board a flight to Turkey and Juraboev was arrested after purchasing a plane ticket to Turkey scheduled to depart a month later. They both pled guilty and were sentenced to 180 months.

- ***U.S. v. Davis*, 15-CR-00059 (JRH) (S.D. Ga.) – 180 months:** Davis was arrested at the Hartsfield-Jackson Atlanta airport after he purchased a ticket to fly to Turkey in an effort to join ISIS in Syria. He pled guilty and was sentenced to 180 months.

- ***U.S. v. Pugh*, 15-CR-001116 (NGG) (E.D.N.Y.) – 240 months**: Pugh traveled from Egypt to Turkey in an effort to reach ISIS-held territory in Syria, but he was denied entry and returned to Egypt. He was then deported to the United States, where he was subsequently arrested. Like the defendant here, Pugh had sought to become a "mujahid" and had consumed ISIS propaganda, including execution videos. He was convicted of violating section 2339B and obstruction of justice, for which he received a sentence of 180 months and 60 months, respectively, to run consecutively. The Second Circuit later upheld the 240-month sentence in a summary order. *See id.*, Doc. No. 200.

- ***U.S. v. Al Hardan*, 16-CR-00003 (LNH) (S.D. Tex.) – 192 months:** Al Hardan was arrested in 2016 when he was 24, after communicating with an FBI CHS since 2014 about traveling to Syria to fight with ISIS. Like the defendant here, Al Hardan had taken the oath of loyalty to ISIS and had accessed and posted ISIS related materials on his social media accounts and computer devices. Al Hardan pled guilty and was sentenced to 192 months.

- ***U.S. v. Raishani*, 17-CR-00421 (GHW) (S.D.N.Y.) – 240 months:** Raishani and a co-conspirator agreed to travel overseas to join and fight for ISIS in Syria, with the co-conspirator to depart first. Raishani later told an undercover law enforcement source and two other undercover employees that Raishani was seeking to travel to Syria. Raishani was arrested at JFK International Airport as he prepared to board a flight to Turkey. He pled guilty to two counts in violation of section 2339B and was sentenced to 240 months and 60 months, to run concurrently.

- ***U.S. v. Alebbini*, 17-CR-00071 (WHR) (S.D. Ohio) – 180 months:** Alebbini was arrested at the Cincinnati/Kentucky International Airport, as he was attempting to travel to Turkey and then Syria to join ISIS. He was convicted at a bench trial of attempting and conspiring to provide material support and resources to ISIS and sentenced to 180 months for each count, to run concurrently.

- ***U.S. v. Abdin*, 17-CR-00283 (RMG) (D.S.C.) – 240 months:** Abdin was arrested at the Charleston International Airport when he was 18 years old, as he was attempting to travel to Jordan and ultimately to Syria or Egypt to join ISIS. Abdin had communicated with an FBI undercover employee regarding his plans to fight once arriving in Syria, and he had sent the undercover employee a video of his pledge to al-Baghdadi. Abdin pled guilty to one section 2339B violation and was sentenced to 240 months.

- ***U.S. v. Augustine*, 18-CR-00393 (SJ) (E.D.N.Y.) – 240 months:** Augustine was arrested in Tunisia when he was 20 years old, while he was attempting to join ISIS in Libya. He was returned to the United States and convicted at trial, during which the government presented evidence of Augustine's consumption of violent ISIS propaganda similar to that which the defendant accessed and disseminated here. Augustine was sentenced to 240 months.

- ***U.S. v. McCormick*, 19-CR-00263 (KAD) (D. Conn.) – 144 months:** McCormick was arrested in October 2019, when he was 26 years old, as he attempted to board a plane that would fly him to Canada, with the ultimate goal of reaching ISIS in Syria. In the month before his arrest, he had communicated with FBI CHSs regarding his intent to travel and he sought their assistance in arranging to leave the country from a small private airport. The defense presented significant evidence concerning McCormick's diagnosed schizophrenia and mental health treatment that—unlike for the defendant here—dated to before his charged conduct, and the government agreed that McCormick had significant mental health issues relevant for sentencing purposes. *See id.*, Doc. Nos. 195, 200, 216. The sentencing judge also observed that McCormick had "a rather trauma-filled childhood." *Id.*, Doc. No. 216 at 62. However, like the defendant here, McCormick had a history of being unreceptive to mental health treatment and medication. The sentencing judge expressed "concern about recidivism, a risk that is heightened by the possibility that Mr. McCormick will again decide that he doesn't need medication when he's out in the community, and it counsels a further period of incarceration." *Id.* at 64. McCormick pled guilty and was sentenced to 144 months.

The defendant directs the Court to a different sample of outlier cases, including *U.S. v. Nasr*, 24-CR-00019 (ANT) (S.D.N.Y.), where defendants received significantly lower sentences. The Government does not agree with the sentences imposed in those cases but in any event, they all featured circumstances that distinguish them from the defendant's case here.

In *Nasr*, the defendant sought to join the terrorist organization al-Shabaab in East Africa and was sentenced to 60 months of imprisonment. The record in that case indicates that Nasr's cleared defense counsel submitted classified information for the court's consideration at sentencing, to which the parties in this case do not have access, and it remains uncertain what role such information might have played. *See id*., Doc. No. 58. In addition, at the sentencing hearing, the judge found that Nasr had "struggled with mental health conditions that have undermined his psychosocial development, ostracized him from his peers, and worsened his sometimes challenging relationship with his family." *Id.*, Doc. No. 73 at 34. Unlike the defendant here, who has presented certain mental health diagnoses only in the run-up to sentencing, Nasr had been diagnosed with autism when he was two years old. *Id*. In addition, the court pointed out that before Nasr had encountered any government actors, Nasr's online conduct was characterized by statements such as that he "wants to make friends" and that "it's very hard to find other Egyptians who are religious." *Id.* at 38. The judge also found that by the time of sentencing, Nasr "had demonstrated a sincere desire to live a law-abiding life, as evidenced by his letter submitted to the court, his completion of several courses at [the Metropolitan Detention Center], and his clean disciplinary record while detained." *Id.* at 42.[10] Unlike Nasr, the defendant was already an avid consumer and purveyor of radical jihadist and ISIS propaganda who had made his bay'at oath and was committed to traveling to join ISIS at the time he first encountered CHS-1. And also unlike Nasr, the defendant has still not repudiated the ISIS ideology he was steeped in leading up to his arrest and his record in detention since then has been marked by a series of disciplinary infractions.

The other outlier cases the defense cherry-picks are also distinguishable. In *U.S. v. Hossain*,

[10] The judge in *Nasr* also expressed concern with the "extraordinarily harsh" conditions of the Metropolitan Detention Center (MDC) in New York where Nasr had been housed following his arrest. *Id.* at 43.

19-CR-00606 (SHS) (S.D.N.Y.), the court imposed a 96-month sentence of imprisonment for a defendant who had violated sections 2339A and 1705 for attempting to join and support the Taliban. Unlike the defendant here, who spent years online researching ways to reach ISIS in Syria and shared news about the terrorist attacks ISIS perpetrated there, the judge described Hossain as "a confused, naïve individual who had an unrealistic and simplistic plan…" *Id.*, Doc. No. 194 at 83. Unfortunately, as is evident by the wave of foreign fighters who reached the Syrian battlefield from the West, the defendant's well-considered and well-researched plans here were not "unrealistic" or fanciful. And unlike in *U.S. v. Natsheh*, 16-CR-00166 (RS) (N.D. Cal.), where the defendant made a statement to the court fully renouncing the ideology reflected in the ISIS propaganda he once shared, there is no such evidence that the defendant here has reversed course. Nor is *U.S. v. Daniels*, 16-CR-00222 (EAS) (S.D. Ohio) an appropriate comparator, given that Daniels had a more serious schizophrenia diagnosis when the court sentenced him to only 80 months. Moreover, Daniels' subsequent history reflects that his low sentence was not sufficient to prevent his recidivism. Following Daniels' release from custody in 2021, he was found to have violated his supervised release conditions. *See* Doc. Nos. 106 (summons) and 108 (minute entry for supervised release revocation hearing).

Sentences like those in the cases included in the defense memorandum are not accurate benchmarks for comparison with this defendant, and they are closer to those sentences the Second Circuit has found "shockingly low" and "strikingly low" in other terrorism cases. *See United States v. Ceasar*, 10 F.4th 66, 80 (2d Cir. 2021) (internal quotation omitted) (finding 48-month sentence substantively unreasonable for defendant who had served as an intermediary for other U.S.-based individuals seeking to travel to ISIS-controlled areas, and who sought to become an ISIS bride, herself). Avoiding unwarranted disparities here actually demands a sentence of imprisonment that

is much higher than that requested by the defense and, at the very least, significantly higher than that in *U.S. v. McCormick*, where another defendant in this district had serious, documented mental health diagnoses pre-dating his criminal conduct, which was similar to the defendant's conduct here but less extensive and of a shorter duration.

### C. The Section 3553(a) Factors Support a Life Term of Supervised Release and the Special Conditions Included in the PSR

The record of the defendant's radicalization and his use of computers and the internet to further radicalize others also supports the parties' joint recommendation of a life term of supervised release, as well as the imposition of the special conditions of supervised release included in the PSR.

"[D]istrict courts have wide latitude to impose special conditions of supervision as they deem appropriate." *United States v. Browning*, 2026 WL 2263720, at *4 (2d Cir. Aug. 6, 2026) (internal quotations and citations omitted). After considering the factors set forth in section 3553(a), a court may set any condition it considers to be appropriate that are "reasonably related" to those factors. 18 U.S.C. § 3583(d); U.S.S.G. § 5D1.3(b). The Court must make "an individualized assessment when determining whether to impose a special condition of supervised release, and to state on the record the reason for imposing it." *United States v. Betts*, 886 F.3d 198, 202 (2d Cir. 2018).

Here, among the special conditions that the Court should impose are conditions reasonably related to the defendant's history of attempting to associate with, recruit, and further radicalize other extremists and ISIS supporters, including through his use of computers and the internet. PSR ¶ 113 (Special Conditions 2–3 and 5–7). There is ample information in the PSR and surrounding record to support such conditions, including the defendant's digital footprint in the year leading up to this arrest and his own statements about his intent to join with other ISIS "brothers" to carry

out ISIS's commands, on both the real-life and digital battlefields. Moreover, as the Second Circuit found in another case involving a convicted ISIS supporter (who also resided in the New Haven area), a special condition limiting a defendant's "association with criminal or terrorist enterprises" is "self-evident" in relation to a section 2339B offense. *United States v. Rakhmatov*, 2022 WL 16984536, at *3 (2d Cir. Nov. 17, 2022) (citation omitted)). Special conditions like those included in the PSR "seek to prevent reversion into a former crime-inducing lifestyle by barring contact with old haunts and associates, even though the activities may be legal." *See United States v. Hendricks*, 69 F. App'x 592, 597 (4th Cir. 2003) (citation omitted). And conditions such as these have been upheld as not vague or overly broad. *See Rakhmatov*, 2022 WL 16984536 at *3 (upholding special conditions substantially similar to Special Conditions 2 and 3 in the PSR); *United States v. Schiff,* 876 F.2d 272, 276 (2d Cir. 1989) (upholding condition forbidding parolee from "associat[ing] with any group that advocates non-compliance with the tax laws); *United States v. Green*, 618 F.3d 120, 123 (2d Cir. 2010) (per curiam) ("The term 'criminal street gang' is cabined by a clear statutory definition that would permit Green to comply with the condition and permit officers to consistently enforce the condition."); *United States v. Ross,* 476 F.3d 719, 722–23 (9th Cir. 2007) (upholding supervised release condition requiring defendant to refrain from associating with known neo-Nazi/white supremacist groups); *United States v. Showalter*, 933 F.2d 573, 575–76 (7th Cir. 1991) (similar).

Similarly, the Court should adopt Special Condition 9 that prohibits any contact with the CHSs referenced above or their family members, and seeks to ensure compliance through monitoring. The defendant has already expressed his willingness to hurt and kill those who do not follow his extremist beliefs, whether he knows those individuals or not. He will only be even more motivated to attack those he perceives as "spies" who have stymied his attempt to join ISIS.

By imposing these and the other special conditions included in the PSR, the Court will make clear that the defendant is to avoid the people and materials that have previously led him to violate the law and endanger the public, and avoid individuals who played a role in the Government's investigation. As a result, these conditions are related to the statutory goals of deterrence, protecting the public, and rehabilitation.

## V. Conclusion

For the foregoing reasons, the Court should sentence the defendant to 180 months in prison and a life term of supervised release with all of the special conditions that are included in the PSR.

Respectfully submitted,

DAVID X. SULLIVAN
UNITED STATES ATTORNEY

*/s/ John Cella*
JOHN CELLA
TRIAL ATTORNEY
Federal Bar. No. phv209581
National Security Division
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20004
Office: (202) 353-3909
John.Cella@usdoj.gov

NEERAJ PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. phv04499
United States Attorney's Office
157 Church Street, 25th Floor
New Haven, CT 06510
(203) 821-3700
Neeraj.Patel@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2026, a copy of the foregoing was filed electronically with the Court and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF system.

*/s/ John Cella*
JOHN CELLA
TRIAL ATTORNEY
National Security Division
United States Department of Justice